**Billy Conn GARDNER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69235.**

Court of Criminal Appeals of Texas, En Banc.

March 25, 1987.

Bruce Antòn, Dallas, for appellant.

Henry Wade, Dist. Atty. and Jeffrey B. Keck, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for State.

---

1. Omitting its formal parts, the indictment alleges appellant did:

"... knowingly and intentionally cause the death of Thelma Catherine Row an individual, hereinafter called deceased, by shooting the said Thelma Catherine Row with a handgun and the defendant did cause the death of the deceased while the said defendant was in the course of committing and attempting to commit the offense of robbery of deceased[.]"

## OPINION

CLINTON, Judge.

Appellant was indicted and convicted of the offense of capital murder, V.T.C.A. Penal Code, § 19.03(a)(2).[1] The jury made affirmative findings to the special issues in Art. 37.071(b)(1) and (2), V.A.C.C.P., and punishment was assessed and pronounced accordingly, at death. His cause is now before us on direct appeal pursuant to Art. 4.04, § 2, V.A.C.C.P.

### Sufficiency of the Evidence

Initially Appellant challenges the sufficiency of the evidence to establish his guilt in this offense. Specifically he asserts that the evidence fails to corroborate the testimony of the accomplice witness, Melvin Sanders, as required by Art. 38.14, V.A.C.C.P.[2] Appellant does not elaborate on this point.

Generally the evidence shows that on the afternoon of May 16, 1983, appellant entered a backroom of the cafeteria at Lake Highlands High School in Richardson and, in the course of robbing the manager, Thelma Catherine Row, as she counted the day's receipts, shot her. The bullet punctured Row's liver, and eleven days later she died.

Melvin Sanders testified that he was married to Paula Sanders, who in May of 1983 was an employee of the cafeteria at Lake Highlands High School. Through conversations with his wife Sanders learned that the cafeteria brought in receipts of as much as several thousand dollars a day. Feeling that he himself was too well known at the cafeteria from picking up his wife from work, Sanders approached appellant several times about the possibility of "robbing the place." Sanders testified:

2. Art. 38.14, V.A.C.C.P. reads:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

"I told [appellant] that they counted the money in the back right by the back door and that all that would be involved is going in, more or less showing them that you had a gun and was serious, and that that would be basically it. I was sure they would just hand over the money."

Eventually it was agreed that appellant would actually commit the robbery and Sanders would drive the getaway car. They originally planned to commit the offense on the afternoon of Friday, May 13, but when they could not obtain dilaudid, a heroin substitute, which both men apparently felt it was necessary to inject in order to pluck up their courage, the scheme was postponed until the following Monday. On Monday Sanders drove appellant to the school. After some brief reconnoitering, Sanders parked in an alley close by, and appellant got out. In "eight or ten minutes" he returned and told Sanders, "She didn't want to up the money. I shot that old woman." They fled in the car.

The trial court instructed the jury that Sanders was an accomplice as a matter of law and that it could not convict appellant upon Sanders' testimony unless it found "other testimony in the case, outside of the evidence of the said Melvin Sanders tending to connect [appellant] with the offense committed[.]"

█ In determining the sufficiency of the evidence to corroborate the testimony of an accomplice, we eliminate from consideration the accomplice's testimony and examine the remaining evidence to ascertain whether it independently tends to connect the accused to the commission of the offense. *Killough v. State*, 718 S.W.2d 708 (Tex.Cr.App.1986). Putting aside entirely the testimony of the accomplice Sanders we find the following evidence.

On the day of the offense Paula Sanders, wife of the accomplice, was in training to become the assistant manager of the cafeteria. Pursuant to her training, she was sitting in Row's office learning how to take care of the day's receipts. She testified that as the money was counted it was placed in "some bags that zipped like bank

bags." The double doors leading out to the loading dock continually slammed shut as the garbage was carried out. Sanders sat with her back to these doors.

From behind her Sanders suddenly saw a man's arm and a gloved hand holding a revolver. The man wore a "lightish-blue, grayish-blue work shirt." A grocery sack was dropped on the desk and the man demanded, "Put the money in, fill it up, hurry up," or words to that effect. He also ordered them not to look at him. Row began to fill the sack with money. Before she could finish the man reached for the sack, and apparently when Row did not immediately relinquish it, he shot her at close range. Then he fled.

Another cafeteria employee testified that she observed the man from behind during the course of the offense, and that he wore "faded-out blue jeans and a blue work shirt." She also saw a stocking pulled down over the back of his head.

Lester Mathews, a custodian at the high school, testified that at two o'clock on the afternoon of the offense he observed a man he identified as appellant standing beside the loading dock outside the double doors through which the killer would soon enter and then flee. Appellant was wearing "jeans, a light blue shirt, and white painter's cap," and was smoking a cigarette. Beneath the painter's cap Mathews could see a stocking.

Lavone Newsome testified that he had known appellant for about fifteen years, and that at the time of the offense appellant was living with a woman named Odessa Wingfield. Sometime after 3:00 p.m. on the afternoon of the offense Newsome went to Wingfield's apartment and found appellant and Melvin Sanders on the floor of the bedroom, counting money. The money was in the form of "bills and change." Also present were some bags used for carrying money, upon which Newsome could see the word "Richardson". Appellant and Sanders "were pretty excited." ·

*Approximately two months after the offense appellant arranged through an inter-*

mediary to sell two pistols, one of which was a Charter Arms .357 revolver. The buyer immediately contacted police. The .357 revolver was shown positively to be the murder weapon.

■■■ The corroborative evidence need not directly link the accused to the offense or be sufficient in itself to establish guilt. *Killough v. State,* supra. "It is sufficient if the combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses tends to connect the accused with the commission of the offense. *Granger v. State,* 683 S.W.2d 387 (Tex.Cr.App.1984)." *Romero v. State,* 716 S.W.2d 519, 523 (Tex.Cr.App.1986). Here, appellant was seen outside the cafeteria moments before the offense was committed wearing clothing similar to that of the robber, and with a stocking tucked under his cap. This evidence *does* directly link him to the commission of the offense. The money bags and his participation in the counting of "bills and change" later on the afternoon of the offense tend indirectly to connect him, as does, albeit somewhat more tenuously, his attempted sale of the murder weapon two months later. Indeed, we cannot say that a rational jury could not have convicted appellant on the basis of this circumstantial evidence, even absent Sanders' testimony.[3] We hold that the accomplice witness was sufficiently corroborated in this cause, and thus the evidence was sufficient to establish appellant's guilt.

Appellant also argues, again with little embellishment, that the evidence at the punishment stage of trial was insufficient to sustain the jury's affirmative finding on special issue (b)(2) under Art. 37.071, supra, which requires a determination "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]"

The State introduced three penitentiary packets reflecting that from early 1961 until the time of trial appellant had been convicted of eleven felony offenses, including seven convictions for burglary and one for aggravated assault of a police officer. Not surprisingly, five Dallas police officers testified that they had known for fifteen to twenty years of appellant's reputation for being "a peaceful (sic) and law-abiding citizen," and that it was bad. Implicit throughout the testimony at both stages of trial was the fact that appellant had been addicted to narcotics his entire adult life.

Additional evidence was presented that two months after the offense in this cause was committed appellant entered a convenience store in Dallas and robbed the clerk at gunpoint, threatening to kill him and exclaiming, "Hurry up. I need a fix bad."

Finally evidence was introduced that in the early morning hours of October 2, 1966, appellant and an accomplice commandeered a grocery store with shotguns and terrorized a number of the stockers for several hours until the store manager arrived to open the safe. During this ordeal appellant asked one of the stockers if any female employees would be arriving to work before the manager—the implication being that appellant wished to indulge in some form of sexual assault to pass the time. In the course of relieving himself against a stack of cold drink cartons, appellant urinated "all over the side of [the] neck and the back of [the] head" of this same stocker, a seventeen year old boy at the time.

■ Given appellant's long history of drug-induced recidivism and his proven propensity for the use of deadly weapons in the commission of offenses against the person in support of his apparently unshakeable habit, the jury was justified in concluding appellant would in all probability constitute a continuing threat to society. Although defensive testimony was adduced in an effort to mitigate the impact of the

3. The corroborating evidence tends to connect appellant to those elements of the offense which distinguish it as a *capital* murder, *viz.,* that it was committed intentionally and in the course of committing robbery. Thus the evidence would be sufficient in this cause even under the rule in *Fortenberry v. State,* 579 S.W.2d 482 (Tex.Cr.App.1979), recently abandoned in *Holladay v. State,* 709 S.W.2d 194 (Tex.Cr.App.1986). See *Romero v. State,* supra.

foregoing evidence,[4] viewing all of the evidence in the light most favorable to the verdict, *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr.App.1986), we conclude it was sufficient to sustain the affirmative finding under Art. 37.071(b)(2).

### Voir Dire

In appellant's fifth ground of error he asserts that the trial court erroneously granted the State's challenge for cause against venireman Maxine Hooper, on the ground that she could not assess answers to special issues under Art. 37.071, supra, independently of a finding that an accused was guilty of "intentionally" committing capital murder. Appellant maintains that Hooper never demonstrated herself to be challengeable upon this ground, and that her disqualification was predicated upon no more than "inartful questioning."

Ordinarily the same evidence tendered at the guilt stage of a capital trial to carry the State's burden to prove guilt of the substantive offense of capital murder will be resubmitted at the punishment stage as part of the State's evidence going to proof on special issues. Indeed, absent applicability of the law of parties, it will be the extraordinary case in which evidence sufficient to prove an "intentional" murder for purposes of § 19.03(a)(2) will not also serve in whole or in part to establish the killing was "committed deliberately and with the reasonable expectation that ... death ... would result." Art. 37.071(b)(1), supra. Nevertheless, that these are discreet inquiries, to be considered independently of one another by the jury, was firmly estab-lished in *Heckert v. State,* 612 S.W.2d 549 (Tex.Cr.App.1981), which held that a negative answer to special issue one does not dictate an appellate finding of insufficient evidence to prove an "intentional" murder under § 19.03(a)(2). See also *Fearance v. State,* 620 S.W.2d 577, 584 (Tex.Cr.App. 1981).

It is certainly appropriate, therefore, to ask a venireman whether he can independently weigh the evidence adduced at the guilt stage, first for its probativeness to establish guilt, and then again later at the punishment stage for its probativeness on special issues. Clearly the venireman who answers this question affirmatively has no bias against the law. More to the point is the question whether a finding of guilty would "automatically" dictate a result in the mind of the venireman as to special issues, without consideration of evidence brought forward at the punishment stage of trial, or further consideration of the guilt evidence as it relates particularly to resolution of those issues. For only upon manifesting an inability, once the issue of guilt has been resolved against the accused, to *reconsider guilt evidence in the particular context of special issues,* has a venireman demonstrated himself unable objectively to follow the law. Such a venireman would certainly be subject to a State's challenge for cause, for clearly this is a "phase of the law upon which the State is entitled to rely for ... punishment," Art. 35.16(b)(3), V.A.C.C.P. See *Nethery v. State,* 692 S.W.2d 686, 691 (Tex.Cr.App.

---

4. Evidence was adduced in mitigation documenting appellant's unhappy life: that as a child of eight appellant already worked to help support his family; that he assumed the blame for mischief perpetrated by his older siblings because he knew his alcoholic father would not punish him; that this condition changed just before appellant turned ten years old when a younger brother was born, after which appellant could do no right in the eyes of his father and was severely beaten on a number of occasions; that at about this same time appellant was forcibly injected with heroin by a cousin of his father, apparently leading to his addiction; that appellant's sister was raped by their father, which trauma appellant was instrumental in helping her cope with; that his mother had divorced his father in order to abate the brutality; that appellant had married at age 17, but his first wife soon died; and that with a second wife he adopted a baby, but this wife subsequently disappeared with the child. It was also shown that while awaiting trial appellant had "accepted Jesus as [his] personal Lord and Savior," and that during his previous stints in the Texas Department of Corrections he had been helpful to other inmates, a hard worker, and had never instigated trouble. Appellant's counsel argued that appellant's future dangerousness was purely a function of his drug addiction, and that incarceration for life was clearly the proper response, in view of his proven record for docility and productivity in the penitentiary.

1985); *Phillips v. State,* 701 S.W.2d 875, 885–86 (Tex.Cr.App.1985).

On Hooper's direct voir dire it was established that she had reservations about the death penalty. Under questioning by the trial judge, however, she clearly indicated she could answer special issues in the affirmative in the event she believed the evidence supported such a finding beyond a reasonable doubt, despite her reservations. The State never challenged Hooper on the ground of inability to follow the law in this respect. The State's first challenge for cause came when Hooper indicated she would require more than the testimony of a single eyewitness to convict an accused of capital murder, even if she believed that witness' testimony beyond a reasonable doubt. Again, under questioning by the trial court the juror was rehabilitated, and the challenge for cause was denied. The prosecutor then proceeded by further questioning to try to show that in her deliberation upon special issues she would in fact be influenced by her reservations about the death penalty, contrary to her earlier assertions. But in so doing he inadvertently stumbled into the following colloquy:

"Q. [BY THE PROSECUTOR]

... Now, can we ever get there, can we ever prove beyond a reasonable doubt that the questions should be answered yes, or because you are so opposed to being part of this kind of case, that it's going to weigh on your mind, and we could just—we just couldn't get there, we couldn't prove to you that those questions should be answered yes?

[OBJECTION AS TO REPETITIVE-NESS OVERRULED]

A. These are, yes sir. There is no doubt in the three questions.

Q. I'm sorry. I don't understand what you're saying, Miss Hooper. I am not making myself clear, apparently.

A. Do you know what I'm saying?

THE COURT: I think I do. But, you need to state it for the record, because I don't want to put words in your mouth.

A. You said these were the questions?

Q. [PROSECUTOR] Yes ma'am.

A. I said I answer yes to all of them.

Q. Under what circumstances?

A. Well, I just said—whether it was committed deliberately, would he do it again.

Q. *Then, once you found a person guilty of the offense of capital murder, I take it, then, that that has answered those questions for you. They are answered yes. Is that right?*

A. *Yes.*

Q. *We wouldn't have to bring you any more evidence before you would answer those questions yes. You find him guilty, and they are answered yes?*

A. *Right.*[5]

Q. So there will be no misunderstanding what I am talking about here, it's two separate trials. We have got to bring you evidence in both trials. The evidence may be brought in the first trial that answers all three of those yes. But, the law says that we must prove to you beyond a reasonable doubt that they are to be answered yes. They aren't automatically answered yes simply because we have proved that he is guilty beyond a reasonable doubt, proved that he is guilty of capital murder. We start over again. But, is that clear?

That is the procedure. Is that clear to you?

A. Yes.

Q. How that works?

A. Yes.

Q. *But, some people have told us, that if they are guilty of capital murder, then that answers those three questions. Now, are you that type of person who that is what you believe?*

A. *Well, yes.*

Q. All right.

A. It's the death sentence that is throwing me.

Q. I understand. It's a weighty problem. That's why I was asking you earlier if the death sentence would affect you on deliberating in this case. Would it?

A. I don't know.

5. All emphasis supplied unless otherwise indicated.

Q. Okay. But, so that it would be clear, if you find the defendant guilty of capital murder, then, you would automatically answer those three questions yes because it's already been proven to you. Is that right?

A. Well, they are right.

Q. Does that mean that yes, they have already been proven to you and you would answer them yes if we proved he is guilty?

A. Well, then where am I going to be? One would be death, and then if I believe him—

Q. Is this emotionally trying for you, ma'am?

A. No. I'm just trying to be honest.

Q. I understand. And I appreciate your honesty and candor in this. Apparently, I am just not being clear on this. I am going to put it to you one more time, and just as clear as I can. Two separate phases, you understand that, of a trial. There is the guilt phase and there is a penalty phase. Is that clear?

A. Yes.

Q. Now, I will just ask you pointblank, if you find this person guilty of the offense of capital murder, *if we have proven to you beyond a reasonable doubt that he is guilty, are those questions in the penalty phase, that separate phase, already answered yes for you?*

A. *Yes.*

Q. Okay.... Judge, we submit the juror."

In spite of her acknowledgements to the prosecutor that she understood that in the bifurcated capital proceeding the State has the burden of proving affirmative answers to special issues apart from its burden of proof as to guilt of the substantive offense, what subsequently transpired seems to belie the notion that she genuinely did:

"Q. [BY DEFENSE COUNSEL] Are you saying, Miss Hooper, that the questions are already yes, or that you would have to hear more testimony, or that you are not automatically making up your mind about it, but, you would listen to anything that either side had to present to you and then decide whether the question was yes or not?

A. Well, I wouldn't make up my mind until I heard it, I'm sure.

Q. I'm sorry.

A. I said I wouldn't make up my mind until I heard it, but it says deliberately, it says will he do it again, unreasonable.

Q. But, you're not saying that you would just automatically answer the questions yes, that instead of doing it automatically, you would listen to what either side had to present?

A. Oh yes.

Q. In determines [sic] what the answers to the questions should be?

A. Yes.

[BY DEFENSE COUNSEL]: We submit she is qualified, your Honor."

At this point, perceiving an inconsistency, the trial court intervened and once again attempted to explain that the trial would take place in two phases, the first to determine guilt or innocence, and the second, assuming a guilty verdict, to determine by resolution of special issues what punishment to impose. Judging from Hooper's confused responses, it is far from clear that she understood the explanation. It is thus difficult to determine what she meant when replying to the judge's subsequent inquiry:

"THE COURT: All right .... let's just say you have found the defendant guilty of capital murder. Here we go to the second trial, the punishment phase, and those three questions are submitted to you. Okay? Would you answer those questions, or any one of them yes just because you had found the defendant guilty, just because the evidence caused you to find him guilty?

THE WITNESS: Well, they would all be because you found him guilty.

THE COURT: Okay, without any further evidence that would be sufficient for you to answer those questions yes. Is that correct?

THE WITNESS: Yes."

On redirect the prosecutor again had Hooper affirm that upon a verdict of guilty the special issues "are already answered yes."

Sensing that Hooper did not truly comprehend the nature of the questions posed by the court and prosecutor, defense counsel began his cross voir dire as follows:

"Q. Miss Hooper, I may be wrong about what the mixup is. Are you saying in response to [the prosecutor's] questions that you wouldn't even come to those three questions unless you had found the person guilty of capital murder? In other words, you wouldn't be called on to answer the three questions unless you had found a person guilty of capital murder."

This seemed to come as a revelation to Hooper:

"A. Is that right? You wouldn't be called on—

Q. Unless you found him guilty. .

A. I didn't know that.

Q. Do you understand that?

A. I didn't know that, yes."

After further explanation, the following exchange took place:

"A. All right, then, what was the question?

Q. You understand there is two proceedings, if you find the defendant guilty. If you find him not guilty, we all go home.

A. Right.

Q If you find him guilty of capital murder, then, those three question are presented to the jury.

A. Okay.

Q. Would you listen to the testimony from either of both sides in answering those three questions?

A. Well yes.

Q. So, *it's not just automatically because you had found the defendant guilty of capital murder that you could say, well, I don't need to hear anything else. I can answer these questions right now.*

A. *No.*

Q. You would listen to other testimony presented by either or both sides before answering those three questions?

A. Right."

By this point the venireman had received the clearest explanation yet of how the bifurcated proceeding operates, and she affirmed that she would "listen to" any evidence presented at the punishment phase and would not "automatically" answer special issues affirmatively on nothing more than a verdict of guilty, *without hearing more*. Still unsatisfied, however, the trial court again interposed, first explaining one more time the procedural scheme in a capital case, and that special issues are not presented unless a verdict of guilty is returned, and then continuing to question in the following vein:

"THE COURT: Would you require either side to bring any more evidence in, or would you answer those questions yes based on what you heard in the first part of trial, no matter what the evidence is later, you would answer it yes just because you found him guilty, you would do that, all three of those questions?

THE WITNESS: I didn't know there was two parts. I didn't know they would bring more—

THE COURT: They could, or they might not. But, the point is, both sides are asking you this question.

THE WITNESS: *Would I listen or would I not listen?*

THE COURT: The question both sides are asking you is, are you telling me that finding the defendant guilty would be enough for you to answer all three of those questions yes without anything further except the evidence to support the guilty verdict, and if that were the case, would you answer them all yes without anything further?

THE WITNESS: I don't know. I didn't know they would bring more.

THE COURT: Well, they could.

THE WITNESS: *Why would they after all of that?*

THE COURT: *Well, the State has the burden of proving those answers beyond a reasonable doubt.*

THE WITNESS: *I think they already would.*"

Thus, venireman Hooper appears to have demonstrated a continuing inability to fath-

om, even after seemingly grasping for the first time how special issues operate in the bifurcated capital procedure, why any further evidence would *ever* be required beyond that sufficient to establish guilt beyond a reasonable doubt to answer special issues affirmatively. Finally the trial court asked the venireman:

"THE COURT: That gets us back to where we are talking about. You're saying if you found the defendant guilty of an offense based on the evidence you heard, when you found him guilty of capital murder, the evidence which would support that guilty verdict would support a yes answer to those three questions, is that what you're saying?

THE WITNESS: I think so.

THE COURT: All right. You wouldn't have to hear more, if you did, fine, but if you didn't, you wouldn't have to to answer those questions yes. Is that correct?

THE WITNESS: Yes."

At this point the State's challenge was sustained.

In positing the last two questions in this final colloquy the trial court undoubtedly intended to ascertain whether Hooper would invariably or "automatically" answer special issues affirmatively upon rendering a guilty verdict. Unfortunately the questions are ambiguous. When Hooper confirmed that "the evidence which would support [a] guilty verdict would support a yes answer to those three" special issues, she did not *necessarily* demonstrate a bias against the law. This Court has said repeatedly that the same evidence may support both. By the same token, Hooper did not *necessarily* prove herself excludable for cause by affirming that she "would not have to" hear more evidence at the punishment stage in order "to answer [special issues] yes," since in any given capital case this may well be true. Hooper's answers to these questions are no more determinative than are the questions themselves.

■ Nonetheless, given the immediately preceding statement that she thought by proving up the substantive offense of capital murder the State "already would" have carried its burden of proving affirmative answers to special issues beyond a reasonable doubt, the trial court could reasonably have concluded that Hooper indicated a belief that evidence sufficient to establish "intentional" capital murder under § 19.-03(a)(2), supra, would *invariably* suffice also to establish affirmative answers to special issues. It is true that, once she seemed finally to understand the procedure, Hooper indicated a willingness to "listen to" further evidence that might be presented at the punishment phase. She failed even at this point, however, to understand the reason further evidence would ever be necessary once guilt was established beyond a reasonable doubt. Clearly the trial court had a proper standard for exclusion in mind when he sustained the challenge, even though his last two questions were insufficient in themselves to determine whether Hooper met that standard. Finding an adequate basis in the record to support the trial court's conclusion that Hooper would not be able to reconsider guilt evidence independently for purposes of resolving special issues, we hold that it was not error to sustain the State's challenge for cause. This ground of error is overruled.

■ In his ground of error number six appellant asserts that the trial court abused its discretion in curtailing counsel's line of questioning during the voir dire of venireman Linda Kirklin concerning her understanding of the difference, if any, between a murder committed "intentionally," § 19.03(a)(2), supra, and one committed "deliberately and with the reasonable expectation that the death of the deceased or another would result," Art. 37.071, (b)(1), supra. Ordinarily we would be constrained to hold that this ground of error is controlled by *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978) and its progeny, *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr. App.1980) and *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980). In these cases the Court has held that it is not an abuse of the trial court's discretion to prohibit questioning of veniremen regarding terms which, having no statutory definition, are left to

the juror's understanding based upon common meaning and usage, at least so long as the prohibition is imposed in the interest of reasonably limiting the already lengthy capital voir dire procedure. On the facts of the instant case, however, we find that any interest the trial court might have had in limiting voir dire was clearly outweighed by appellant's right to interrogate venireman Kirklin, not only to enable counsel to intelligently exercise the peremptory challenge, but also with a view to laying a predicate for a proper challenge for cause. Thus we hold that the trial court abused its discretion.

On direct examination by the State, venireman Kirklin indicated she was "for" the death penalty. She further indicated she felt the death penalty to be appropriate in any case in which "someone takes the life of another person on purpose," but when informed on direct and cross voir dire that for a killing to constitute a capital murder it must be committed in the course of perpetrating one of certain enumerated felonies, she agreed she could follow the law in this respect. Bifurcated trial and the operation of special punishment issues were explained to her, and it was impressed upon her that she must answer special issues objectively, without "opinion" or emotion, simply "yes or no depending on what the facts are[.]" She was told the State would not have to prove "premeditation" or "pre-planning" in the killing.

During cross voir dire defense counsel read to the venireman the statutory definitions of "intentional" and "knowing," see V.T.C.A. Penal Code, § 6.03(a) and (b), after which the following exchange transpired:

"Q. ... If you find that an individual has knowingly or intentionally caused the death of another human being in the course of committing another enumerated felony, da-da-da-da-da—
A. Right.
Q. Would you automatically answer the question whether the conduct of the Defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased of another would result, would you answer that question yes? In other words, it boils down to the short form of the question without all of the definitions, if you found that an individual knowingly and intentionally killed another human being, would you answer question number one yes automatically?
A. If it's proven to me, without even a reasonable doubt.
Q. Beyond a reasonable doubt.
A. Beyond a reasonable doubt.
Q. Okay. Let's see if we can clarify this a little bit. If you found, on the guilt or innocence stage of the trial, that a person had knowingly and intentionally caused the death of another human being, when you got to the punishment stage and they asked you question number one, whether the conduct of the Defendant that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased or another would result, would you automatically answer that question yes?
A. Yes, sir."

The question was then reiterated, with the additional hypothesis that the State would present no evidence at the punishment stage. Asked again whether she would "automatically" answer special issue one affirmatively, Kirklin replied, "I don't think so, no. I would have to think about it." Again the question was posed, but Kirklin expressed confusion. Once more defense counsel ventured:

"Q. ... [The State] has proven that he has knowingly and intentionally killed someone. They have proven that.
A. And he is guilty?
Q. That he is guilty, that is correct. That's exactly right.
    Now, after you find him guilty, then we get into the punishment phase, and we have a two-stage trial here, in essence.
A. Right.
Q. Find him guilty or not guilty. If you find him guilty, then you come back and you hear punishment evidence. Okay? Knowing that you found him guilty of

knowingly and intentionally killing somebody, would you automatically answer yes to question number one, that he did it deliberately and with a reasonable expectation that death would result?

A. Your word 'automatically,' I think, is what is throwing me. I guess I would have to say yes, with all of the evidence, and intentionally and knowingly doing what he did, and the evidence is there, and it's in my mind, and I have weighed both sides, I would say yes.

Q. Okay.

A. That 'automatically' is what throws me.

Q. Well, what I am asking is, and you are right, 'automatically' is the word that we are zeroing in on.

You have already heard evidence that he knowingly and intentionally did it. You believe that beyond a reasonable doubt. You found him guilty. Right?

A. Uh-huh (Positive).

Q. Okay. Now, we go on to the second stage of the trial. Would you automatically find the answer to question number one yes?

A. Yes."

At this juncture appellant challenged Kirklin for cause on the ground that she was "unable to return a verdict on an independent finding on question number one." The prosecutor was then afforded an opportunity to rehabilitate Kirklin, and the questioning continued as follows:

"Q. ... Now, what [defense counsel] I think is asking you is merely because you found somebody guilty, just because you said somebody is guilty, are you going to automatically, without thought, answer that question yes or no, or are you going to look and see if the evidence is there? I think what you are telling us is if the evidence is there to prove it.

A. Yes, sir.

＊　　＊　　＊　　＊　　＊　　＊

Q. ... Let me go back to my example we used. I go and rob [prosecutor's cocounsel]. He doesn't get the money for me fast enough. I intentionally shoot him in the leg. His injury to his leg causes his death. I am guilty of capital murder. I intentionally caused his death by shooting him with a handgun while in the course of committing robbery. You have answered that question. You found me guilty.

Now, merely because you have done that, are you automatically going to say I acted deliberately and with a reasonable expectation that he died? Or will you wait and hear the evidence and see if the proof can come from the State to show you that I acted with a reasonable expectation that he die when I shot him deliberately.

Do you see what I am saying?

A. Yes, sir.

Q. Do you see the difference there?

A. Yes, sir.

＊　　＊　　＊　　＊　　＊　　＊

Q. Can you see how that question could be answered no even if the state didn't bring you any further evidence? For instance, where I go in and rob [cocounsel], and I shoot him in the leg. Do you see how you can find that although I may have deliberately shot him in the leg, I didn't have a reasonable expectation that he die when I shot him? Do you see how that question can be answered no?

A. Yes, I do now, yes.

Q. Now, do you see why it's very important that you not automatically answer the question yes, merely—

A. Yes.

＊　　＊　　＊　　＊　　＊　　＊

Q. Now, let me phrase it exactly as [defense counsel] phrased it. Even if the State brings no further evidence, and you had found the Defendant guilty of capital murder, would you automatically answer that first question yes?

A. No. ＊ ＊ ＊ 'Automatically' was throwing me

Q. Any question about it now?

A. No question about it."

Appellant's challenge for cause was then refused, and his request to further question the venireman on the same point was at first denied. Appellant then objected to

"the premature termination of [his] questioning on the grounds that the juror's answers were predicated on some inaccurate statements of the law by [the prosecutor]." Indeed!

In positing to Kirklin the hypothetical of shooting his cocounsel in the course of committing a robbery the prosecutor was apparently trying to illustrate that what would amount to an intentional killing would not necessarily constitute a killing perpetrated "deliberately and with the reasonable expectation that ... death ... would result." It is not quite clear whether he was attempting expressly to distinguish an "intentional" from a "deliberate" killing, or simply trying to show that an intentional and deliberate act is not always done with the expectation that death would result. At any rate, what is clear is that by his hypothetical he intended to show the venireman that finding an accused guilty of an intentional killing would not "automatically" dictate an affirmative answer to special issue one. Unfortunately the hypothetical does not embrace facts which amount to a capital murder. Thus it utterly fails to illustrate the intended point.

The operative theory of capital murder in this cause is that defined in V.T.C.A. Penal Code, § 19.03(a)(2), which reads:

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

\*　　\*　　\*　　\*　　\*　　\*

(2) the person *intentionally commits the murder* in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault or arson ...."

Clearly, to be found guilty of the offense of capital murder under this provision an accused must have specifically intended the death of his victim. The scenario posed by the prosecutor certainly presented facts which could constitute the offense of murder under either V.T.C.A. Penal Code, § 19.02(a)(2) or (3); [6] or even under § 19.02(a)(1), supra, inasmuch as it may show a "knowing" killing. But the shooting of a robbery victim *in the leg* in order, e.g., to prevent apprehension, even if an intentional and deliberate act, would not render the actor susceptible to a conviction for capital murder, because on its face it does not show that the actor intentionally *caused the death* of the deceased. In fact, the hypothetical does not show a "capital" murder at all. Thus, it cannot possibly serve to demonstrate to the venireman an example of a "capital" murder that might have been "intentional" but would not have been "committed deliberately and with the reasonable expectation that ... death ... would result." It therefore could not logically serve to rehabilitate a venireman who has stated that a guilty verdict on the substantive offense of capital murder would "automatically" cause her to answer special issue number one in the affirmative.

In response to appellant's objection that his questioning of the venireman had been prematurely terminated, the trial court decided to "withdraw ruling on the challenge" and allowed appellant to recross her. At this point appellant tried what can only be regarded as the most direct approach to determine Kirklin's understanding, thus:

"Q  Ms. Kirklin, very briefly, if I said you were wearing a striped dress, you would answer yes?

A  Yes.

Q  If I said your dress is striped, your answer would be yes? It's two ways of asking the exact same question, right, about whether your dress is striped or not. Right?

A  Yes, sir.

---

6. These provisions read:

"(a) A person commits an offense if he:

\*　　\*　　\*　　\*　　\*

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than voluntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

Q What I am asking you, in essence, you know the definition of knowing and you know the definition of intentional. Right?

A Uh-huh (Positive).

Q Okay. What I am asking you is does deliberately and with a reasonable expectation of a result, does that mean the same thing?"

At this point the following objection and dialogue ensued:

"[PROSECUTOR]: I will object to that as being an improper attempt to qualify the juror on her definition of the terms in sentencing issue number one.

THE COURT: Sustain the objection.

[PROSECUTOR]: Ask that the juror be instructed to disregard the question.

THE COURT: Please disregard the last question.

[DEFENSE COUNSEL]: Your Honor, we would object to the Court's ruling on the basis of [the prosecutor's] objection, on the grounds that it prematurely terminates our ability to question this juror about not what her definitions are, but about whether if her definition of deliberateness and with reasonable expectation of results is exactly the same as knowingly and intentionally.[7]

THE COURT: The objection remains sustained.

[DEFENSE COUNSEL]: I'm sorry, your Honor. I don't understand the ruling.

THE COURT: [The prosecutor] objected. I sustained the objection that he made. You are asking me to withdraw my ruling. You are asking me to reconsider my ruling on this objection to your question?

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: I will not reconsider my ruling. It remains the same. His objection to your question in that regard is still sustained.

[DEFENSE COUNSEL]: Then, we would except on the grounds enumerated, and we would preemptorily [sic] challenge this juror."

Thereupon the trial court excused venireman Kirklin, and the following exchange occurred:

"[DEFENSE COUNSEL]: Your Honor, for record purposes, we would object to the Defense having to use a preemptory [sic] challenge on Juror No. 1, Ms. Kirklin, for grounds that we were afforded an incomplete voir dire, and we will renew this objection if and when we exhaust our preemptory [sic] challenges, and we will further ask the Court for additional preemptory [sic] challenges.

THE COURT: Well, I note the Court recognizes the objection to the juror being excused, of course, being overruled. I want to point out several things for purposes of the record and also to make it clear, that first of all, the Court withdrew it's [sic] ruling on the challenge for cause in that matter, and that was resubmitted to the Court, and the Court was not advised that the challenge for cause was still asserted by the Defense, and that the Defense exercised a preemptory [sic] challenge.

I recognize your complaint that you were not given an appropriate time or allowed to ask the appropriate questions on the actual voir dire. Even if the Court is in error regarding whether or not the challenge for cause was properly asserted a second time after the ruling had been withdrawn by the Court, the Court notes the original questions upon which the first challenge for cause was made against this juror as phrased by the Defense Counsel, incorporating the definitions of intentionally and knowingly in the question.

In the Court's opinion it's entirely impossible that a person could answer Special Issue No. 1 in a death penalty case of having found a person intentionally, knowingly causing the death of another individual, just as the evidence as to whether or not there ought to be evidence about the type of crime involved in any capital case can be evidence on Spe-

---

7. Counsel for both appellant and the State were apparently of the view that they were legally prevented from ever inquiring as to a venire-man's understanding of the meaning of "deliberate." We know of no authority in statute or caselaw to substantiate this notion.

cial Issue No. 2, about the continuing threat to society without more, and based on that reasoning, if the Court is in error, and if the challenge for cause was not preserved, and it's overruled on that basis."

■ As our disposition of the previous ground demonstrates, the State, and *a fortiori*, an accused, may successfully challenge for cause the venireman who is unable to reconsider guilt evidence in the particular context of special issues. Certainly the venireman who cannot distinguish between an "intentional" and a "deliberate" killing will have substantial difficulty in this regard. See *Heckert v. State,* supra. However, having failed to reassert his challenge for cause before exercising his peremptory challenge on venireman Kirklin, appellant now posits his ground of error in terms of deprivation of the intelligent use of his peremptory challenge.

In *Smith v. State,* 703 S.W.2d 641, at 643 (Tex.Cr.App.1985), it was observed:

A trial court's decision to restrict voir dire may only be reviewed to determine whether the restriction constituted an abuse of discretion. *Smith [v. State,* 513 S.W.2d 823 (Tex.Cr.App.1974)]. The test for reviewing a trial court's restriction of voir dire was recently reaffirmed: 'If the question is *proper,* an answer denied prevents intelligent use of the peremptory challenge and harm is shown.' *Powell [v. State,* 631 S.W.2d 169 (Tex.Cr.App. 1982)] at 170, quoting *Mathis [v. State,* 576 S.W.2d 835 (Tex.Cr.App.1979)] at 837. See also *Smith,* supra. Therefore, to show an abuse of discretion, a defendant must demonstrate that the question he sought to ask was proper. If the question was proper and the defendant was prevented from asking it, then harm is presumed because the defendant could not intelligently exercise his peremptory challenges without the information gained from an answer.

A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Powell,* supra; *Smith,* supra; *Mathis [v. State,* 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959)] at 632...."

Unquestionably, appellant's attempt to ascertain if "deliberate and with a reasonable expectation of a certain result," meant "the same thing" to Kirklin as the definition he gave her of "intentional" was a proper inquiry.[8] By indicating on cross voir dire that she would "automatically" respond affirmatively to special issue one, Kirklin had already proven herself susceptible to a challenge for cause, at least absent rehabilitation or some clarification of her response. As we have demonstrated *ante,* no genuine rehabilitation was forthcoming. Although the prosecutor was able to make Kirklin "see" that an affirmative answer to special issue one would not "automatically" follow from a finding of "intentional" capital murder, the basis of her new insight was flawed. The only reasonable thing for appellant to do at this point, for purposes of intelligently exercising a peremptory challenge, or, indeed, reestablishing a predicate for challenge for cause, was to go straight to the heart of the matter. A venireman who fails to perceive a difference between "intentional" and "deliberate ..." will certainly have problems reconsidering guilt stage evidence for its probativeness toward special issues, or for that matter, considering any new evidence presented at the punishment phase with the requisite degree of impartiality.

Judging from its final pronouncement, the trial court was apparently of a mind that it is "entirely impossible" that any reasonable juror would fail to discern a difference between the statutory terms. That is hardly a tenable position in view of the fact that at least four current members of this Court would favor submitting a requested jury instruction which would instruct jurors, *inter alia,* that "the word 'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge...." *Williams v. State,* 674

---

8. That Kirklin might not be able to distinguish a "knowing" killing from one committed "deliberately ..." is more or less immaterial in a prosecution under § 19.03(a)(2), since under this provision the murder must be committed "intentionally."

S.W.2d 315, 322 n. 6 (Tex.Cr.App.1984). See also *Penry v. State*, 691 S.W.2d 636, 657 (Tex.Cr.App.1985) (Clinton, J., concurring); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App.1983) (Clinton, J., dissenting). We hold that the trial court abused his discretion in disallowing appellant's question.

Having found error, however, we perceive no harm, notwithstanding the language of *Smith v. State*, supra, set forth *ante*. Kirklin is the only venireman appellant claims he was prevented from questioning in this regard. While we recognize that he was denied the opportunity intelligently to exercise his peremptory challenge against her, he does not assert his opportunity to exercise peremptory challenge against any other juror during the process of individual voir dire was similarly impaired. At the time that he exercised his fifteenth and last peremptory challenge appellant requested five additional peremptories, without citing any challenge for cause on his part that had been erroneously denied or any specific peremptory challenge he had been forced to use due to premature termination of questioning. The trial court granted him two. Under these circumstances, any harm rendered appellant by having to exercise a peremptory unintelligently against Kirklin was nullified.[9] Therefore, appellant's ground of error number six is overruled.

In his fourth ground of error appellant asserts that his challenge for cause against venireman Buford Stevens was erroneously denied. Relying upon *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978), and cases following it, appellant argues that by indicating that he would always "lean toward" believing the testimony of a police officer, Stevens evinced a bias against appellant.

In *Hernandez v. State*, supra, at 950, venireman Abel testified she didn't believe a police officer "would tell a falsehood from the witness stand ... [u]nder any circumstances." This Court held that such a response "effectively demonstrated bias against" the defendant, and, apparently in view of the fact that most of the material witnesses were police officers, abuse of discretion was found in overruling the challenge for cause. We find no such abuse of discretion in the instant case.

Stevens was a former reserve police officer of fifteen years experience. On cross voir dire he indicated that he "would give more credence to" the testimony of a policeman than "a civilian witness," and "would be more inclined to believe a police officer than ... other witnesses." The questioning continued:

"Q. Now, you have been out there with those police officers for all of those years. Do you feel that if a police officer took the witness stand and testified, that you would give more credence to what the officer said than you would another type of witness?

A. The only thing, the police officer usually gets his information from someone else, and that's the way it's written down. But, if he is at the scene of the crime, then, I would take the officers—

Q. Word?

A. Right.

Q. In other words, if a police officer were a fact witness, in other words, an observer of a witness to a situation, and he testified with regard to that, and others testified differently, you're saying

9. In *Smith v. State*, 703 S.W.2d 641, *Powell v. State*, supra, the two *Mathis* cases, both supra, and in *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr. App.1985), the defendant was prevented from posing a proper question to the entire jury panel, not simply a single venireman. In that event it is clear that encroachment upon the right to representation of counsel under Art. I, § 10 of the Texas Constitution, see *Mathis*, 322 S.W.2d at 631, has infected the entire process of jury selection. The harm is manifest. In *Smith v. State*, 513 S.W.2d 823, the defendant complained he was prevented from posing a proper question during the individual voir dire of twelve separate venireman. Again, in that event the harm would be evident. The *Smith* Court found the question to be "duplicitous," however, and thus ruled there was no error in the first instance in disallowing it.

By contrast, in this case the error infected the voir dire of but a single venireman. Because appellant was awarded additional peremptories, the infection was cured.

that, per se, you would believe the police officer?

A. Right.

Q. Any doubt in your mind about that?

A. No, sir.

Q. And that would be because he is a police officer?

A. Well, he is usually honest and fair, and that's his duty to be.

Q. That's the experience you have had in working with police officers?

A. Right.

＊　＊　＊　＊　＊　＊

Q. Do you believe that police officers would tell the truth regardless?

A. Sure, sure do.

Q. And you have a high regard for police officers?

A. Yes, sir.

Q. And a high regard for their testimony?

A. Right.

Q. More so than any other type witness?

A. Yes, sir."

On this note appellant challenged Stevens for cause. The State was then allowed to proceed, as follows:

"Q. Okay. I take it that you would listen—or part of the reason that your believing of a police officer is because of their training and their experience, their ability to look at something and actually relate to someone else what they did observe, where other people don't have that training or experience. Is that correct? Is that a fair statement?

A. Yes, sir.

Q. And that's one of the things you would want to know about, whether or not this was a ten-year veteran or a rookie. Is that a fair statement?

A. Right.

＊　＊　＊　＊　＊　＊

Q. What I think I hear you saying is, that you believe a police officer because of their training, their qualifications, their ability to observe and relate, or more likely to observe and see things and relate it correctly because of that training and experience than another person in the same kind of or similar situation. Is that what I hear you saying?

A. Right.

Q. But, to be a fair juror, you wouldn't automatically say just because somebody has got a blue uniform on, I'm going to believe everything he says, or most of it or anything else. You would want to hear about it before you decided whether or not he was telling you the truth or not telling you the truth about a particular fact situation. Is that a fair statement?

A. I would have to weigh it all the same.

Q. That's right. You would have to listen to them testify. In other words, is it a fair statement to say you're not going to automatically believe them just because they are a police officer, that you would listen to them first and then decide how much of what they are telling you you want to believe?

A. I would lean towards the officer, if the officer testified to certain things a certain way, and someone else come up and said it a different way. If they wasn't at the scene, and the officer wasn't at the scene, I would go with the officers."

The prosecutor then advised Stevens that "the law says you have got to judge every witness by the same standard, and that means that again you're going to have to exercise some self-discipline, you see?" Asked whether he could exercise such self discipline and set aside his feelings that a police officer would always tell the truth, "and just judge them individually after they testify[,]" Stevens replied, "I think so."

On recross Stevens was asked who he would believe between a police officer and an ordinary citizen, "not knowing anything else," in the event they gave conflicting testimony.

"A. I would just have to hear both sides of it to make a decision on it.

Q. All right. Would you give any more credence to the police officer's testimony than you would the witness?

A. There is a possibility. Like I say, I would have to hear both sides of the evidence.

\* \* \* \* \* \*

Q. I guess what we are down to, and I had understood what you had told me earlier was that you did have that confidence in police officers because you had worked with them, and not everybody is a reserve police officer for 15 years. But, because you have worked with them, and because you know the type people that they are, then if a police officer took the stand and testified, you would give more credence to his testimony than you would a laywitness. I understood that's what you said earlier. She can't hear you nodding your head.

A. Yes, sir.

Q. Do you still feel that way?

A. *Well, I would weigh both sides, but, I would lean toward the officer."*

At this point appellant reasserted his challenge for cause and the trial court took over questioning:

"THE COURT: Mr. Stevens, you said that you would lean towards the officer. Tell me why.

THE WITNESS: Well, sir, *the officer supposedly has the correct information, the best of his ability, and if his information is correct, I would have to go along with it. But, if someone else down the line could disprove it, well, then, I might be persuaded the other way."*

Argument was then made to the trial court. Appellant argued Stevens was subject to challenge because he had shown that, "all things being equal, he would give more credence to a police officer's testimony than he would to a layperson's testimony[.]" The State responded that Stevens answers had been "predicated upon waiting and hearing what the evidence is." Indicating he was not sure he yet understood Stevens' position, the judge then asked him to give up his preconceptions as to the degree of training and experience of a hypothetical police officer and assume that officer had had the same perspective as an

ordinary witness, but had given conflicting testimony:

"[THE COURT]: What would be your position with respect to the credibility of those witnesses as one against the other, just at that point?

Would you—well, I don't want to put words in your mouth. You tell me what your position is.

THE WITNESS: Well, sir, after I heard both sides of it, I think there would be a little lean toward the police officer, *because he has thoroughly investigated.*

THE COURT: Well, you don't know that in my fact situation. He is just a witness, just like if you were a witness. To get to that point, what is your position?

THE WITNESS: *I would just have to hear the whole story.*

THE COURT: In other words, you would hear the testimony from both sides and make up [sic] which one of them was telling you the truth beyond a reasonable doubt?

THE WITNESS: Right."

The trial court then overruled the challenge for cause and refused to allow further questioning.

■ Though Stevens initially indicated he would believe the testimony of a police officer "regardless," he made it clear on redirect that his deference was not so much to any unfailing honesty he perceived on the part of all policemen so much as his own personal knowledge of their investigatory training and experience. He repeatedly indicated he would listen to and weigh "both sides" of the testimony on any given issue. That he would "lean toward" the testimony of the police officer, as opposed to a laywitness, only reflected this deference to what he assumed to be the officer's superior powers of observation—not at all an invalid consideration in weighing the reliability of any witness, provided the record bears out the assumption. Once the trial court managed to free him of his preconceptions about whether the hypothetical policeman had the "correct information," or had "thoroughly investigated" the case, Stevens affirmed that he would determine witness credibility only after

hearing "the whole story." As our recitation of the evidence presented at trial shows, little of the evidence critical to determining appellant's guilt, and only the usual rote reputation testimony at punishment, was elicited from police officers in this cause. Under these circumstances we find no abuse of discretion under *Hernandez v. State*, supra, and hence, no error.

In his third ground of error appellant maintains the trial court erred in sustaining the State's challenge for cause against venireman Elsenia Fears. The State challenged Fears "on the basis of her inability to understand and thus properly follow the law." Citing Art. 35.16(a)(5), V.A.C.C.P., the trial court sustained the challenge. Appellant now asserts the voir dire of Fears did not demonstrate "such ... mental defect as to render [her] unfit for jury service," and therefore the trial court abused its discretion in excluding her.

Fears' voir dire was relatively brief. She initially expressed an aversion to the death penalty: "Within me I just couldn't agree with it no way whatever way it come up. I just wouldn't feel right. I wouldn't—I couldn't live with myself." She affirmed that she could not "be involved in a verdict which would result in the death of a fellow human being." The prosecutor then briefly explained the difference between the function of the jury in assessing punishment prior to 1973, and that of simply answering special issues under the present capital sentencing scheme. Along the way Fears was asked what the result of affirmative answers to all three special issues would be, to which she responded, "... they still would give him death." In an effort to ascertain whether Fears' opposition to the death penalty would impair her ability to answer special issues objectively, the prosecutor continued questioning as follows:

"Q. Okay. So as I understand you, it doesn't matter what the evidence shows, you could never answer those three questions yes, yes, yes because it would result in what? What would happen?

A. I say one way or the other. Whether I say—He would continue to death or either the State would get the injection, you know, the other, you know, the injection thing.

Q. Okay. I'm probably not being real clear on this, but do you remember if you answer all three questions yes, what does the judge do?

A. Repeat that, the first part of that question before you asked me for the three. Repeat—I didn't quite get that part.

Q. Let me tell you the facts, how it works. If all three questions are answered yes, death penalty. One or more answered no, life sentence; right? Let me ask you. If all three questions are answered yes, what does the judge do?

A. Well, he would give—I say him, he would just give him life."

The prosecutor again informed her that affirmative answers to the three special issues would dictate a death sentence, but again upon being asked the result of three "yes" answers, Fears replied, "Life." Once more the prosecutor explained that the result would be death. Then:

"Q. I'm going to ask you if all three questions are answered yes, what does the judge do?

A. He just sentences him to—

Q. To what?

A. He sentences him to death, like you said.

Q. Is that clear? Is there any question about that? Three yes equal death.

A. Yes, I think that's clear.

Q. Now, let me ask you this. What happens if one of the questions is answered no?

A. Well, in that case, we would have to make a decision there, review the testimony or brief, whatever it is, and make a decision from that which would be, you know, in the interest of a person being found, you know—we have to do it over again, you know."

Yet again the prosecutor explained to her there are "[t]wo trials. One, did he do it; two, what does he get for doing it." She was told that in determining "what does he get for doing it," she would be called upon

to answer special issues in the second "trial."

"Q. Now, that decision is made the way the jury answers three questions. If all three are answered yes, three equals death, one or more no's equals life.

A. Uh-huh.

Q. Those questions in front of you, Ms. Fears, why don't you look at them for just a minute. They're kind of wordy. Do you have any problems reading them, Ms. Fears?

A. No.

Q. Okay.

A. Uh-huh.

Q. Do you see how none of those questions asked whether the defendant lives or dies?

A. Uh-huh.

Q. Do you see how all three can be answered yes or no?

A. Uh-huh.

Q. Remembering what we talked about a moment ago, let me ask you because I know it's kind of hard to understand. I have a hard time understanding the law, and I'm a lawyer. I know it's awful hard for people to understand the law who haven't studied it. But if all three of those questions are answered yes, what is the result? What does the defendant get if all three questions are answered yes?

A. Well, in this case here, the person— if he's, you know, found guilty, they would just either weigh—

Q. No, ma'am. Forget about—Just what is the result? You answer yes, yes, yes. What does he get?

A. He would just get—he would get life, life in prison."

At this time the State challenged the venireman on the basis noted *ante*. Appellant's counsel refused the opportunity to question Fears himself, but simply stated: "I think just because she gave one wrong answer doesn't disqualify her as far as being—We will object to her being excused." Before ruling on the challenge, the trial court questioned Fears himself. It was carefully explained to her that the first function of the jury in a capital case would be to determine guilt or innocence, and that if guilt was found beyond a reasonable doubt, the jury would then proceed to resolution of special issues. Again she was informed that three 'yes' answers would result in a verdict of death, while a negative response to any one question would mandate a life sentence. The trial court continued:

"Q. Okay. Now, the question I want to ask you that's already been asked of you but I want to be clear about your understanding, that if you had found a person guilty in a capital murder case and you were submitted those three questions and you believed beyond a reasonable doubt that the answer to the first question should be yes, and that the answer to the second question should be yes, and that the answer to the third question should be yes, what sentence would the judge have to give the defendant in that situation? I'm not trying to trip you up, I just want to know what you understand to be the case.

A. Just give me a minute.

Q. Yes, ma'am.

A. In that case, they would give him the death penalty.

Q. Okay. Now, the first time—in fact, the first several times that same question was asked of you, it was asked of you a little differently, you know, like where you have yes, yes, yes, in the three questions. It was explained to you that that would be the case, but you indicated you thought it meant that would get a life sentence. Now, you tell me it's the death penalty, are you just guessing or is that something you know to be the case? You can be straight up with us. Nobody's trying to trip you up. I just want to know if you were just guessing at what the answer should be to my question or is that what you know to be the answer.

A. I said I think that's the answer. I said I think. I'm not sure, but I think the answer to your question—that it is.

Q. You think the answer to my question is that the result would be death?

A. Uh-huh.

THE COURT: The Court's going to sustain the challenge on the basis of 3516, [sic] Section 4,[10] basically because the Court believes that the prospective juror does not fully grasp the concepts involved which would have first to be grasped before either side could test the person's feelings about the death penalty and how that bears on findings of guilt, reasonable doubt and the answers to the questions.

I'm not sure who's going to be subserved by this sustaining of this challenge, but under the circumstances, and for the grounds I've stated, the Court so rules.

Appellant now argues that no "mental defect" is apparent on the face of Fears' voir dire. Quoting Webster's New Unabridged Dictionary Deluxe Second Edition (1983), he argues there was no showing of a defect which "renders the person markedly subnormal intellectually, in the range from idiocy to moronity." Citing federal caselaw dealing with standards for selecting jury *panels* in federal court, he implicitly argues that exclusion of veniremen on the basis of low, but not "markedly subnormal" intelligence, violates his Constitutional right under the Sixth Amendment to a jury composed of members taken from a fair cross section of the community.[11] We refuse, however, to indulge in any inquiry into the precise clinical nomenclature to be assigned to a venireman before he may be excluded for cause under Art. 35.16(a)(5). ▮▮▮ The State is entitled to jurors in a capital case who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980). While Fears had expressed reservations as

to her ability to participate in a process that might result in imposition of the death penalty, whether her views "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath[,]" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 850, 83 L.Ed.2d 841, 849 (1985), was a question left unanswered. Specifically, it was not determined whether Fears' aversion to the death penalty would likely inject "conscious distortion or bias" into her deliberations upon the Art. 37.071 special issues. Fears was simply unable to comprehend *what would be* her duties as a juror in accordance with her instructions and her oath. Thus the State was prevented from testing her qualifications under the standard enunciated in *Adams* and *Witt*. We find it significant that, given the opportunity, appellant did not attempt to prove otherwise by, e.g., demonstrating that Fears' confusion was due to ambiguous questioning by the prosecutor and trial court. Under the circumstances the trial court did not abuse its discretion in sustaining the State's challenge.

▮▮▮ We do not thereby hold that apparently low intelligence is *per se* a ground for challenge under Art. 35.16(a)(5). Rather, we hold that a venireman's inability to comprehend the limited function of a juror at the punishment phase of a capital case may constitute "such ... mental defect ... as to render him unfit for jury service. ...."

### Motions for Mistrial

Appellant's next five grounds of error involve asserted error in the denial of his motions for mistrial after objections to cer-

**10.** Voir dire in this cause began on September 19, 1983. As of September 1 of that year, Art. 35.16(a)(4), supra, was amended to include only the provision that a venireman be challengeable for cause if "he is insane;" that the venireman may have, *inter alia*, a "mental defect" became a ground for challenge under subsection (5). See Acts 1983, 68th Leg., p. 619, ch. 134, § 2, eff. Sept. 1, 1983. We find it inconceivable the trial court found venireman Fears insane, however, and assume instead that the ground for his exclusion was, indeed, "mental defect" under

§ (a)(4) as it had read up until nineteen days before trial began.

**11.** Appellant cites *United States v. Butera*, 420 F.2d 564 (CA1 1970); *United States v. Henderson*, 298 F.2d 522 (CA7 1962); *Rabinowitz v. United States*, 366 F.2d 34 (CA5 1966); *United States v. Dioguardi*, 361 F.Supp. 954 (SDNY 1973); *United States v. Allen*, 588 F.2d 1100 (CA5 1979); *United States v. Kline*, 221 F.Supp. 776 (D.Minn.1963).

tain evidence or arguments by the State were sustained, and the jury instructed to disregard the objectionable matter. Appellant asserts that in each case the prejudice was not susceptible to "cure" by a simple instruction.

In the vast majority of cases in which argument is made or testimony comes in, deliberately or inadvertently, which has no relevance to any material issue in the case and carries with it some definite potential for prejudice to the accused, this Court has relied upon what amounts to an appellate presumption that an instruction to disregard the evidence will be obeyed by the jury. See 1 R. Ray, Texas Practice, Law of Evidence, § 29 (3rd ed. 1980); *Thompson v. State,* 612 S.W.2d 925 (Tex.Cr.App.1981). In essence this Court puts its faith in the jury's ability, upon instruction, consciously to recognize the potential for prejudice, and then consciously to discount the prejudice, if any, in its deliberations. Thus we say the harm deriving from the unresponsive answer has been "cured." This is true "except in extreme cases where it appears that the ... evidence is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." E.g., *Campos v. State,* 589 S.W.2d 424, 428 (Tex.Cr.App. 1979). Whether a given case fits the exception or the rule will depend, of course, upon its particular facts.

In ground of error seven appellant asserts the trial court erred in failing to grant his requested motion for mistrial after the accomplice witness, Sanders, gratuitously alluded to the fact, at the guilt portion of the trial, that appellant had previ-

ously been to the penitentiary. In the course of presenting defensive evidence appellant recalled Sanders and questioned him briefly concerning appellant's physical condition at and around the time of the offense. Specifically, Sanders testified that in the days after the offense was committed appellant had stomach problems and had trouble keeping food down. On crossexamination by the State, the following ensued:

"Q. Did the defendant ever complain to you about stomach problems caused by ulcers?

A. I don't remember or recall the cause. He—The time * * * I offered to take him to the hospital, at that time it came out that he had had a history of stomach problems.

Q. What did he tell you about that?

A. He told me that even when he was in the penitentiary, that he had stomach problems."

Appellant immediately objected, and the trial court responded by instructing the jury to disregard the answer. When appellant moved for a mistrial the jury was excused. After a brief hearing the objection was sustained, the motion for mistrial denied, and upon reentering the jury box, the jurors were again instructed to disregard the last answer.

Relying on *Williams v. State,* 643 S.W.2d 136 (Tex.Cr.App.1982), appellant argues the trial court's instructions to disregard were insufficient in this cause to remove the prejudice engendered by Sanders' nonresponsive reference to appellant's previous sojourn in the penitentiary.[12] We disagree.

---

12. *Williams v. State,* supra, has come under some criticism in the courts of appeals. See *Waldo v. State,* 705 S.W.2d 381, 388 (Tex.App.— San Antonio 1986) (Cadena, J., dissenting).

*Williams* involved a prosecution for the offense of unauthorized use of a motor vehicle. A panel of the Court found that on the facts of that case an unsolicited reference to the defendant's earlier stint in the penitentiary was not an error susceptible to cure by an instruction from the court. Nevertheless, the panel found the error to be harmless beyond a reasonable doubt, and thus affirmed the conviction. Appel-

lant argues that the reference made in the instant cause was both incurable and harmful.

In holding the harm was not cured the panel relied upon *Ulmer v. State,* 106 Tex.Cr.R. 349, 292 S.W. 245 (1927), and *Salinas v. State,* 146 Tex.Cr.R. 358, 175 S.W.2d 253 (1943). In *Ulmer* the defendant was on trial for the rape of his daughter. At trial another of the defendant's daughters was allowed to testify, unresponsively, both that her father had been to the penitentiary, and that he had fathered her illegitimate baby. On its face the opinion does not indicate whether any instruction was given to the jury, but it appears the trial judge simply allowed

That appellant had been to the penitentiary was undoubtedly inadmissible and prejudicial testimony, having no relevance to any issue at the guilt stage of trial. However, that `bare fact, unembellished, was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard it. See *Davis v. State*, 642 S.W.2d 510, 512 (Tex.Cr.App.1982).

■ As crossexamination of Sanders continued, the prosecutor began a line of questioning which suggested appellant's stomach problems were withdrawal symptoms from his dependency upon dilaudid. At an earlier hearing on appellant's motion in limine the trial court had ruled that the only evidence he would allow as to appellant's drug use at the guilt stage of trial would be testimony that he and Sanders injected dilaudid on the day of the offense, and had tried to obtain it on the preceding Friday, when the robbery was originally scheduled. The prosecutor apparently believed questioning of Sanders about appellant's stomach problems had opened the door to evidence of what he hoped to prove was its cause:

"Q. These times he was complaining about being ill, had you and the Defendant used drugs at those times?

A. The complaints were more at times when he wasn't using drugs were when he was complaining.

Q. Okay. Would he be complaining because he was withdrawing from it or hadn't had any?"

An objection that this was "a violation of the Court's ruling," presumably on the motion in limine, was sustained, an instruction given, and a motion for mistrial denied. A short time later the prosecutor asked:

"Q. Okay. Let me ask you at [the time appellant complained of stomach problems] tell us whether or not the complaint was coupled with the fact that he said that it was caused by withdrawal from not using dilaudid?

A. No, he never said that himself. You know, he never said that 'I'm having trouble because I'm in withdrawal," or anything like that, no."

Again, an objection was interposed and sustained, the jury was instructed, and appellant's motion for mistrial denied.

In ground of error eight appellant contends that these motions for mistrial should have been granted. However, we note that a short time after the above colloquys occurred, Sanders was allowed to testify, without objection, to the effect that appellant was a "regular user" of dilaudid. For this reason, see *Woolls v. State*, 665 S.W.2d 455, 470 (Tex.Cr.App.1983), as well as those stated in the previous ground of error, we hold that any harm from the prosecutor's questions was cured.

■ Ground of error nine involves failure to grant a motion for mistrial made during the State's final argument at the guilt stage. At trial Officer Jim Gholston, a homicide investigator with the Dallas Po-

---

both statements over objection. Nevertheless, the Court observed that the error in admitting both statements "is one that cannot be cured. *Haygood v. State*, 104 Tex.Cr.R. 429, 284 S.W. 547 [ (1926) ]."

*Hagood* (not, as miscited in *Ulmer, Haygood* ) presented a situation vastly different from that of *Williams* or the instant case. There the defendant was also charged with rape, and again testimony was allowed that defendant had also attempted intercourse with the complainant's sister. The trial judge admitted the testimony under the mistaken impression the witness was the complainant. When he went to make the charge he discovered his mistaken assumption and proposed to instruct the jury to disregard the earlier testimony. The defendant objected that the harm had been done and to instruct the jury at so late a date would compound, rather than cure it. Accepting this argument, the trial

court did not instruct the jury. This Court held that in agreeing with the defendant that any instruction would come too late, the trial court had manifested an opinion that the harm was incurable. The Court simply deferred to that judgment on appeal.

Clearly neither *Ulmer* nor *Haygood* dictate a finding of incurable harm in this cause. In each case the objection was overruled. In each case the extraneous matter—a sexual offense committed against the complainant's sister—went directly to the heart of the offense for which the defendant stood trial. That in *Ulmer* a reference was made to the defendant's time in the penitentiary only compounded the harm already evident.

*Salinas v. State*, supra, was distinguished in *Richardson v. State*, 624 S.W.2d 912 (Tex.Cr. App.1981). The distinctions noted there are equally applicable to this cause.

lice Department, testified to a deal he made with Sanders to obtain information. Suspecting that the robbery was an "inside" job, and that Sanders had a hand in it because his wife was a cafeteria employee, Gholston applied pressure on Sanders to supply the name of the actual killer. Gholston arranged with prosecutors in Dallas County to decline a recommendation of probation in a forgery case pending against Sanders, requested Tarrant County prosecutors to prosecute a pending robbery charge there "to the fullest," and had a weapons charge brought against him in federal court. In response to this pressure Sanders identified appellant. Additionally, in exchange for apparent transactional immunity against prosecution for the capital murder, Sanders agreed to testify. Understandably, a major portion of appellant's summation to the jury involved questions about Sanders' credibility. Toward the end of his argument, defense counsel maintained:

"And if you don't think that man will tell you a lie, then I've wasted my time here. He'll tell you anything that suits his purposes. He'll tell Detective Gholston anything that will benefit Melvin Sanders.

He'll tell you people, he'll tell Mr. Banks [the lead prosecutor], he'll tell anybody anything at all that will benefit Melvin Sanders, and he's done just that. . . ."

In response, the prosecutor responded that if Sanders' had wanted to lie, "he would have lied big," pointing out some discrepancies in his testimony that had not been accounted for. He then continued:

"But Melvin had to come down here after having passed a couple of tests. He had to pass the scrutiny of Jim Gholston with his 17 years of experience on the Dallas Police Force, your police force.

He had to pass the scrutiny of Jerry Banks, the lead counsel in this death case. He had to pass the scrutiny of those two people before he took the stand—"

A "bolstering" objection was sustained, and the jury was instructed to disregard the statement. Motion for mistrial was overruled, after which the prosecutor resumed:

"Well, let me just rephrase it and say that Melvin Sanders talked to some experienced men, not rookies, and then he comes down here and tells you what he knows to be the truth because he knows that if he lies, his neck is on the line. Now, you don't think that doesn't mean something to him?"

Patently, determination of the credibility of a witness is the job of the factfinder, not investigators and prosecutors. It is thus improper to suggest to the jury that they should defer to another's assessment of the truthfulness of testimony, no matter how "experienced" that other may be. While evidence creating an inference that a witness is not trustworthy may certainly be argued, it is error to argue the jury should believe a witness simply because prosecutors and investigators do. Cf. *Menefee v. State*, 614 S.W.2d 167 (Tex.Cr.App.1981), and cases there cited. (It is error for the prosecutor himself to vouch personally for the honesty or truthfulness of his witnesses.)

■ Appellant now argues that because Sanders' credibility was the pivotal jury determination in this cause, the harm attending the prosecutor's argument was incurable. Again, we disagree. While error, the prosecutor's remarks were not so inflammatory as to overcome the jury's ability consciously to disregard them. Furthermore, the prosecutor was apparently able to "rephrase" the question to suit appellant, as he voiced no objection. We hold that the court's instruction, and the prosecutor's subsequent restatement of the question in a manner acceptable to appellant, cured the harm.

■ In ground of error ten appellant complains of the trial court's failure to grant his motion for mistrial lodged after a police officer, who had investigated the unadjudicated aggravated robbery of a convenience store propounded at the punishment stage, testified as follows:

"Q. [PROSECUTOR] Let me ask you: Did you get a license number from a car and a description of a car?

A. Yes, sir.

Q. Did you later find out about that car and that license number?

A. Yes, sir, I did.

Q. Did you run it down?

A. Well, the license number was on a plate that was stolen shortly before the robbery—"

Appellant's hearsay objection was sustained and the jury instructed. Motion for mistrial was overruled, and immediately thereafter the prosecutor asked the officer, "did you go out and find a car that was stolen?" The officer responded, "I didn't personally find it. I received information on it." No objection followed. Thus, that the officer had received information about an unspecified "stolen" car around the time of the robbery was before the jury despite appellant's prior hearsay objection. Again, for this reason, and because the trial court's instruction was sufficient, any harm was obviated.

Finally, appellant contends his motion for mistrial should have been granted after reference was made to his failure to testify during final argument at the punishment stage.

Among the witnesses called by appellant at this stage were the pastor of the First Christian Church of Seagoville, Steven Spencer, and a former inmate at T.D.C., John Norman. Spencer testified to visiting appellant several times in the Dallas County Jail. During Spencer's first visit appellant accepted Jesus as personal Lord and Savior, and they recited the "Sinner's Prayer" together, which Spencer described as "an act of contrition." On crossexamination Spencer testified appellant denied to him having committed the instant offense, but "said that he thought he knew who might have."

▬ Norman testified as to appellant's good conduct while in T.D.C. On crossexamination he admitted he had not "expressed [his] condolences to the family of" the deceased, but explained that "If I would have known them, I would have."

During the State's final summation the prosecutor argued:

"Now, what did the preacher tell you? You remember the evidence, what was really said. But as I recall it, he talked to him two times. And he said that he confessed that he was a sinner and that he wanted to be saved.

I asked him, 'Did he tell you that he had committed this offense?' 'No, he didn't. We didn't talk much about it.'

Do you think that if he was really going to be truthful with that man that he talked to, that he would have told him everything; that he said, 'I did it?' and if so, that 'I'm sorry it happened?'

You know we've heard a lot from the Defense and we've heard a lot from everything else in this courtroom, but we hadn't heard anybody say that they are truly sorrow about what happened to Caty Row.

[DEFENSE COUNSEL]: To which we'll object, Your Honor. That's a comment on the Defendant's failure to testify.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Ask the jury be instructed to disregard that.

THE COURT: Disregard the statement.

[DEFENSE COUNSEL]: Your Honor, we move for a mistrial.

THE COURT: Denied.

[PROSECUTOR]: Well, I believe I asked Mr. Norman, who came down here and told you—and that's what I was alluding to in my argument—testify for the Defendant about what a great person he was and how sorry he was to see him in this predicament.

And I asked him if he felt that way about the victim in this case, and he told you that he didn't."

Relying upon *Owen v. State*, 656 S.W.2d 458 (Tex.Cr.App.1983), appellant now argues the trial court's instruction did not cure the error.

In *Owen*, at 459, the Court observed: "Art. 38.08, V.A.C.C.P., provides as follows:

'Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.'

A prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions. *Nickens v. State*, 604 S.W.2d 101 (Tex.Cr. App.1980); *Pollard v. State*, 552 S.W.2d 475 (Tex.Cr.App.1977). The language of such a comment must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Griffin v. State*, 554 S.W.2d 688 (Tex.Cr.App.1977); *Hicks v. State*, 525 S.W.2d 177 (Tex.Cr.App. 1975). If the remark complained of called the jury's attention to the absence of evidence that only the testimony from the appellant could supply, the conviction must be reversed. *Myers v. State*, 573 S.W.2d 19 (Tex.Cr.App.1978).

The prohibition against a comment on the defendant's failure to testify is mandatory and the adverse effect of any reference to the accused's failure to testify is not generally cured by an instruction to the jury. *Johnson v. State*, 611 S.W.2d 649 (Tex.Cr.App.1981); *Overstreet v. State*, 470 S.W.2d 653 (Tex.Cr. App.1971)." [13]

The obscure remark made in the instant cause, *viz.*, "we've heard a lot from the Defense and we've heard a lot from everything else in this courtroom, but we hadn't heard anybody say that they are truly sorry about what happened to Caty Row[,]"

certainly can be interpreted as a comment on the appellant's failure to take the stand and personally voice his remorse, as in *Owen.* Indeed, having excluded "everything else" that had been heard "in this courtroom," the prosecutor seems to have called for some evidence of remorse from a source other than those witnesses the jury had heard. This is not, however, a *necessary* construction of the prosecutor's remark. In context, it could have been a further, albeit clumsy, reference to appellant's failure to own up to his offense when Spencer visited him in jail. Regardless of whether this argument would be a proper one in a capital case, see *Thomas v. State*, 638 S.W.2d 481, at 482 n. 3 (Tex.Cr.App. 1982), it does not necessarily imply appellant has failed to *testify* in his own behalf. *Id.*, at 485; *McMahon v. State*, 582 S.W.2d 786, 791–92 (Tex.Cr.App.1978). Alternatively, while the relevance of whatever remorse witness Norman may have felt was, at best, infinitesimal, the prosecutor had nevertheless tried to show at trial that Norman was not "truly sorry about what happened to Caty Row." It is not inconceivable the jury understood his reference to go to that earlier testimony, just as the prosecutor asserted it did.

To the extent the jury may have understood the prosecutor's remarks to be a comment on appellant's failure to testify, any harm which may have resulted was cured by the trial court's prompt instruction to disregard.

These grounds of error are overruled.

### Admissibility of Prior Convictions

One of the penitentiary packets admitted at the punishment stage contained, *inter*

---

**13.** It has also been said that "[s]uch error [as appellant alleges here] is rarely cureable [sic] by an instruction to the jury to disregard." *Dickinson v. State*, 685 S.W.2d 320, 322 (Tex.Cr.App. 1984). Indeed, earlier cases have held that, due to the mandatory nature of Art. 38.08, supra, and its precursors, such error is *never* subject to cure by an instruction. See, e.g., *Lankford v. State*, 156 Tex.Cr.R. 113, 239 S.W.2d 394 (1951); *Minton v. State*, 162 Tex.Cr.R. 358, 285 S.W.2d 760 (1956); *Easterling v. State*, 168 Tex.Cr.R. 219, 325 S.W.2d 138 (1959); 2 Branch, Tex.Pen. Code Ann. § 395, at 414 (2d ed. 1956). More recent decisions have shown that, while it is

indeed rare, it is not unheard of that an instruction to disregard an oblique allusion to an accused's failure to testify may be found to have cured error. See, e.g., *Cook v. State*, 702 S.W.2d 597, at 601 (Tex.Cr.App.1985) (Opinion on State's Motion for Rehearing); *Cannon v. State*, 691 S.W.2d 664, at 677 (Tex.Cr.App.1985); *Hawkins v. State*, 660 S.W.2d 65, at 79 (Tex.Cr.App. 1983); *Davis v. State*, 645 S.W.2d 817, at 819 (Tex.Cr.App.1983); *Wright v. State*, 582 S.W.2d 845, at 847 (Tex.Cr.App.1979); *Thompson v. State*, 537 S.W.2d 732, at 734–35 (Tex.Cr.App. 1976); *Alvarez v. State*, 478 S.W.2d 450, at 452 (Tex.Cr.App.1972).

*alia,* documents entitled "CERTIFIED COPY OF JUDGMENT AND SENTENCE—JURY WAIVED" for three 1962 burglary convictions in the Criminal District Court # 3 of Dallas County. At a hearing conducted prior to commencement of the punishment stage, appellant objected to introduction of these prior convictions on the basis "that the State of Texas has failed to sign a waiver of a jury trial and the judge in [those cases] has failed to except [sic] said waiver." Pursuant to his objection appellant introduced, for record purposes only, three exhibits containing "the contents of the court jacket[s]" for cause numbers D–8161–HIJ, D–8162–HIJ and D–8244–HJ. In his exhibit corresponding to cause number D–8161–HIJ appears a written waiver of appellant's right to a jury trial, signed by appellant, his attorney, the attorney for the State, and the trial judge for the Criminal District Court # 3. This document is dated September 14, 1962, the same date as the judgment and sentence in all three of the burglary convictions. At the top of the page are listed *all three* cause numbers. However, this document does not appear in the exhibits corresponding to cause numbers D–8162–HIJ or D–8244–HJ.

In grounds of error twelve and thirteen appellant now asserts that the trial court erred in admitting evidence of the convictions in cause numbers D–8162–HIJ and D–8244–HJ, in that for these two convictions there was not "a valid signed waiver of jury *in the papers of the cause* according to the black letter law of" Arts. 1.13 and 1.15, V.A.C.C.P.[14] He contends that "[t]he joint jury waiver renders the conviction void upon objection." In support of

this contention he cites *Boyd v. State,* 660 S.W.2d 820 (Tex.Cr.App.1983).

*Boyd* involved a collateral attack upon a conviction used for enhancement of punishment which was found to be void for lack of the *defendant's* written waiver of his right to a jury trial. *Ex parte Collier,* 614 S.W.2d 429 (Tex.Cr.App.1981) was distinguished in that there it was the *State's* failure to consent in writing to the defendant's waiver of jury trial that was the object of the attack. In *Ex parte Collier,* supra at 434, the Court had held:

> "that in the absence of a showing of harm a valid conviction may not be set aside by habeas corpus or collateral attack merely because the State failed to sign the consent to the jury waiver of a defendant as required by Article 1.13, V.A.C.C.P., where the evidence does show that the State did in fact agree to such waiver."

In *Boyd* we refused to extend this holding in derogation of *Ex parte Felton,* 590 S.W.2d 471 (Tex.Cr.App.1979).

The significance of appellant's reliance on *Boyd* is somewhat unclear. If appellant's present complaint may be construed to be an attack upon cause numbers D–8162–HIJ and D–8244–HJ for the reason that "the papers in the[se] cause[s]" do not contain his written waiver of jury trial, his grounds of error fail for two reasons. First, such a ground does not comport with the objection made at trial, which was that the "papers" in these causes do not contain the written indicia of *the State's consent and the trial court's approval* of his waiver of jury trial. Second, while Art. 1.13, supra, expressly requires that the ac-

---

**14.** Emphasis in the original.
  Art. 1.13, supra, reads:
    "The defendant in a criminal prosecution for any offense classified as a felony less than capital shall have the right, upon entering a plea, to waive the right of trial by jury conditioned, however, that such waiver must be made in person by the defendant in writing in open court with the consent and approval of the court, and the attorney representing the State. The consent and approval by the court shall be entered of record on the minutes of the court and the consent and approval of the attorney representing the State shall be in

writing, signed by him, and filed in the papers of the cause before the defendant enters his plea. Before a defendant who has no attorney can agree to waive the jury, the court must appoint an attorney to represent him."
  Art. 1.15, supra, in relevant part reads:
    "No person can be convicted of a felony except upon the verdict of a jury duly rendered and recorded, unless in felony cases less than capital, the defendant, upon entering a plea, has in open court in person waived his right of trial by jury in writing in accordance with Articles 1.13 and 1.14 ...;"

cused's waiver be "made ... in writing in open court," it does not on its face require that this writing be "filed in the papers of the cause," as it does the State's written consent.

■ Construing appellant's grounds to raise the issues that *were* objected to at trial, we nevertheless find no merit. Because the record before us does show that the State in fact consented to his waiver of jury trial in cause numbers D–8162–HIJ and D–8244–HJ, appellant cannot collaterally attack these convictions for lack of the State's written consent "in the papers of the cause," absent some harm attending those convictions. *Ex parte Collier*, supra. *Ex parte Aaron*, 691 S.W.2d 680 (Tex.Cr. App.1985).[15] No such harm is shown. Furthermore, that the trial court's approval does not appear is of no moment. There is no requirement that the court's approval be "in writing, signed by him, and filed in the papers of the cause before the defendant enters his plea." *Story v. State*, 614 S.W.2d 162 (Tex.Cr.App.1981). Appellant does not now assert that the trial court's approval was not "entered of record on the minutes of the court," as is the only requisite of Art. 1.13, supra.

The trial court in this cause did not err in admitting evidence of these convictions. Grounds of error twelve and thirteen are overruled.

### *Instruction on Jury's Consideration of Mitigating Evidence*

■ In voicing his objections to the trial court's proposed charge to the jury at the conclusion of the punishment stage, appellant registered the following complaint:

"We would further object that the Court nowhere directs the jury's atten-

tion to the Defendant's background and family history in mitigation of the punishment."

No specific instruction was requested. In his fourteenth ground of error appellant invites the Court to "reconsider its decision in *Quinones v. State* [592 S.W.2d 933, at 947 (Tex.Cr.App.1980)] and now hold that, *upon timely request*, the trial court must instruct the jury to consider mitigating evidence for whatever weight they give it in answering the special issues."[16] We decline the invitation. See *Stewart v. State*, 686 S.W.2d 118, 121–22 (Tex.Cr.App.1984); *Johnson v. State*, 691 S.W.2d 619, 625–26 (Tex.Cr.App.1985); *Anderson v. State*, 701 S.W.2d 868, 873–74 (Tex.Cr.App.1985).[17]

### *Motion for New Trial*

■ In his final ground of error appellant argues the trial court abused its discretion in denying his motion for new trial. In his motion appellant prayed for a new trial on the ground "that the verdict is contrary to the law and the evidence." A hearing was conducted on the motion on November 1, 1983, at which, without objection by the State, appellant was allowed to develop evidence pertaining to an allegation, not appearing on the face of his motion, of newly discovered evidence.

At the punishment phase of trial the State introduced testimony from Sidney Walton, a convenience store clerk, that two months after the offense *sub judice* appellant robbed him at gunpoint, exclaiming that "he needed a fix bad." The State itself presented evidence that Walton had a pending indictment for felony theft, and another felony theft case pending before a grand jury. Walton testified, however,

---

**15.** Moreover, it appears a narrow majority of the Court is inclined to hold that:

"complaints about failure to comply with [the provisions of Articles 1.13 and 1.15, supra] by an accused who entered his plea after proper admonishments are not cognizable by post-conviction writ of habeas corpus for, even if factually supported, they will not make restraint under the judgment of conviction illegal."

*Ex parte Collier*, supra at 436 (Clinton, J., concurring). *Ex parte Aaron*, supra at 685 (Clinton,

J., concurring opinion in which W.C. Davis, McCormick, Campbell and White, JJ., joined). Presumably this rule would apply to other forms of collateral attack.

**16.** Emphasis in the original.

**17.** Even while overruling appellant's ground of error on behalf of the Court, the writer adheres to views expressed in his dissenting opinion in *Stewart v. State*, supra at 125–26.

that he had obtained no deals in exchange for his testimony. At the hearing at the motion for new trial it was revealed that after the punishment stage had been concluded the prosecutor inadvertently discovered that in addition to the pending theft cases, Walton had had two prior convictions against him in the name of "Watkins." When asked prior to testifying at trial whether he had been in "any more trouble" other than the pending charges, Walton had apparently believed he was being asked about other current charges, and responded that he had not. However, it was shown that in 1958 Walton was convicted and served a two year suspended sentence for the offense of forgery. In 1970 he was convicted of misdemeanor (reduced from felony) theft and served a year in the Dallas County Jail. At the conclusion of the hearing on the motion, appellant urged no bad faith or deliberate withholding of material exculpatory information on the part of the State. The trial court indicated that he would have excluded Walton's prior convictions as too remote to have any bearing on present credibility. See 1 R. Ray, Texas Practice: Law of Evidence, § 658 at 589 (3rd ed. 1980).

Appellant now argues that despite the remoteness of the two prior convictions, they would have been admissible to impeach Walton's testimony, inasmuch as they would operate to prevent any jury recommendation of probation in either of the felony cases pending against him at the time of trial. See Art. 42.12, Sec. 3a(a), V.A.C.C.P. Appellant contends that this fact shows the State had greater leverage over Walton, by virtue of his pending theft charges, than otherwise meets the eye.[18] Even were we to accept this argument, however, we hold that the incremental weight of such evidence to impeach Walton's credibility was not so great as would probably bring about a different result, *viz.*, a negative finding on the issue of future dangerousness, upon a new trial. *Jones v. State,* 711 S.W.2d 35 (Tex.Cr.App.

1986). This ground of error is also overruled.

The judgment of the trial court is affirmed.

TEAGUE, J., concurs in result.

WHITE, J., not participating.

ONION, Presiding Judge, concurring.

I concur only in the result reached by the majority. I would disassociate myself from much of the language and some of the reasoning used. Much of the discussion in the majority opinion is needless and unnecessary to the proper disposition of certain grounds of error, and expresses only the personal views of the writer or a minority of the Court. See, e.g., the discussion on whether the trial court erroneously granted the State's challenge for cause to Maxine Hooper, a prospective juror. I freely predict that much of the unnecessary language will resurface in future opinions as quotes from *the* Court's opinion in *Gardner* when the minority viewpoint is again offered for adoption. We will then be told we have already claimed the renegade in *Gardner.*

CAMPBELL, J., joins this opinion.

18. Considering that it was uncontested the State itself did not learn of Walton's prior convictions until after trial was concluded, coupled with Walton's apparent obliviousness to any manner in which these prior convictions could presently come back to haunt him, we find appellant's argument here somewhat disingenuous.