Robert Arthur HUPP, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–86–00531–CR, 05–86–00532–CR.

Court of Appeals of Texas,
Dallas.

June 20, 1989.

John H. Hagler, Dallas, for appellant.
Michael A. Klein, for appellee.

## ON REMAND FROM THE COURT OF CRIMINAL APPEALS

LAGARDE, Justice.

On this remand, the sole issue to be determined is whether the trial court's submission of the unconstitutional good time and parole instruction to the jury contributed to the punishment the jury assessed the appellant Robert Arthur Hupp. We hold that the submission of the instruction was harmless beyond a reasonable doubt and affirm the trial court's judgments.

Hupp was originally convicted in two cases of aggravated sexual assault of a child under fourteen. The cases were tried together before the same jury, who assessed punishment in each case at life imprisonment. The sentences were allowed

by the trial court to run concurrently. On his appeal to this Court, Hupp contended that he was denied effective assistance of counsel at trial and that the trial court erred in submitting good time and parole instructions to the jury on the grounds that the charge was predicated on an unconstitutional statute. In a published opinion, we rejected his challenge to the constitutionality of article 37.07, section 4, of the Texas Code of Criminal Procedure. *Hupp v. State*, 729 S.W.2d 355 (Tex.App.—Dallas 1987), *vacated*, 761 S.W.2d 10 and 761 S.W.2d 11 (Tex.Crim.App.1988).[1]

In his petition for discretionary review, Hupp asserted that he was denied effective assistance of counsel and that article 37.07, section 4, of the Texas Code of Criminal Procedure was unconstitutional. The Court of Criminal Appeals granted his petition on the constitutional issue only and agreed with his contention that the statute in question is unconstitutional based on its prior decision in *Rose v. State*, 752 S.W.2d 529, 552 (Tex.Crim.App.1988). The Court of Criminal Appeals remanded the cause to this Court to conduct a harm analysis under rule 81(b)(2) of the Texas Rules of Appellate Procedure.[2]

Rule 81(b)(2) provides the general test for harm to be applied by appellate courts in criminal cases. It states:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

This standard requires a review of the entire record.

The record in this case shows that the two victims, J___ (eight years old) and D___ (six years old), Hupp's nephew and niece, approached their mother, Hupp's sister, in November 1985 and told her that

Hupp had been sexually abusing them. J___ told her that Hupp made him get up in the middle of the night and "put [his] P-thing in [Hupp's] mouth and [Hupp] would [put] his P-thing in [J___'s] mouth." D___ told her that Hupp would "put his P-thing in her mouth and that he would stick his fingers up her P-thing." She questioned them both individually; their stories never changed. They also told her that this type of conduct occurred "quite a few times." In fact, the children told her that this had been happening since they moved into the house in February 1985—a period of ten months. D___ suffered from nightmares and was jittery and scared, presumably as a result of Hupp's abuse.

The children's mother stated that she, too, was scared and had been planning to leave town without testifying; however, she had been subpoenaed by the State to testify. Additionally, Child Welfare told her that if she did not "follow through with everything, that they would have to look at [her] fitness of being a mother." She further stated that she dreaded testifying against her brother and that it hurt to do so. After the children told their mother of the abuse, school officials were notified and, ultimately, the police were contacted. Hupp was later arrested.

While in custody, Hupp was given his "Miranda warnings"[3] and made a voluntary statement. In pertinent part, the statement reads:

> I would just be laying in my room at my house at 1602 Park Place in Irving and would feel like something would take over, I mean take me over. I didn't have no control over my body and I would just get up and walk out of my room into the kids room, by the kids I mean J___ and D___, and usually one of the kids would be awake and they would both wake up and just follow me back into my room. The kids would take their clothes off and I would take my clothes off and I would

---

1. The Court of Criminal Appeals addressed each case in a separate opinion.

2. Unless otherwise indicated, all further rule references are to the Texas Rules of Appellate Procedure.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lay down in my bed and they would just go down there and start licking my penis. I couple of times I did take J——'s penis and put it in my mouth. Sometimes I would touch D—— on her vagina. D—— also went down on me and licked my penis. The kids, when they were down there licking on me, both of them would put their mouth over my penis. It was like they knew what to do already. I can't remember how long this has been going on. That's basically it. I would like to attempt to get some psychiatric care if I can.

Officer Charles Cheek of the Irving Police Department testified that while Hupp was making this voluntary statement he was responsive to questions and did not appear to be in a daze or fog. Cheek also stated that Hupp had no difficulty in forming sentences or "carrying through with a thought." Cheek further testified that the words contained in the statement were Hupp's words and that Hupp never stated that he was depressed.

Beth Hall, the children's elementary school counselor, testified that J—— asked permission to write a letter to Becky Fann, one of the arresting officers. In the letter, J—— thanked Officer Fann for arresting Hupp and stated that he loved her and wanted to see her again. The children's counselor admitted that she wrote the words out for J—— to copy, but both she and J—— stated that she had merely written down the words that J—— requested.

D—— testified that the "baddest" things happened in Hupp's room when he would take them in there at night. She also testified that she was scared and claimed that she was unable to remember anything else. J——'s memory, on the other hand, was clearer. On direct examination by the prosecutor, J—— testified:

Q. J——, just relax and just tell the jury in your own words exactly what Robert did.

A. He was putting his mouth on my private part and he was making me put my mouth on his private part.

Q. Now, the private part you are talking about, what do you call that normally?

A. Wiener.

Q. The wiener? Is that his P-thing?

A. Yes.

Q. How many times did Robert put his mouth on your wiener?

A. A bunch.

Q. And how many times did you put your mouth over Robert's wiener?

A. A bunch.

         *    *    *    *    *    *

Q. And Robert actually put his wiener inside your mouth?

A. Yes.

Q. Is that what you are saying?

A. Yes.

Q. Now, do you know whether or not this also happened to your sister, D——?

A. Yes, it happened.

         *    *    *    *    *    *

Q. And when you told your mother, did D—— tell her also?

A. Yes.

Q. No, that's not what I'm asking. What was it that Robert put in your mouth?

A. His wiener.

Q. His wiener?

A. (Witness nods head affirmatively.)

Q. Okay. Now, did anything come out of his wiener?

A. Yes.

Q. What came out?

A. Pee.

Q. And where did it go when it came out?

A. In my mouth.

Q. Did you see what color it was or anything like that?

A. No.

Q. What did it taste like?

A. Bad.

Q. How many times did that happen?

A. A lot.

Q. A lot of times?

A. Yes.

The children's mother testified that J___ and D___ told her that they had not reported this to her earlier because Hupp had threatened to "spank them real hard or else get them" if they told anyone.

In addition to the testimony set out above, one psychiatrist and one psychologist also testified. Dr. James Grigson, the psychiatrist, testified as follows:

Q. Now, as a result of your examination of this Defendant, is it consistent with your examination that the Defendant was depressed during the time of this offense?

A. Absolutely not, no, not at all.

Q. And is it consistent with your examination of this Defendant that he suffered memory loss during the time of the offense or during the time of the written statement to the police department?

A. No, this is intentional and deliberate faking on his part. He has absolutely no physical, emotional or mental problems that would result in any type of memory loss. This is simply faking on his part.

\*    \*    \*    \*    \*    \*

Q. (By Mr. Grett) Does an individual—let me rephrase. Is it consistent with your examination of this Defendant that one accused of an offense against a child, sexually, would have no guilt feelings?

A. There are absolutely no guilt feelings or remorse with regard to his behavior in this type offense.

In addition to Dr. Grigson, Dr. Thomas Cook, a psychologist, testified that Hupp was not out of touch with reality and was competent to stand trial.

Hupp took the stand and testified that he did not remember making the voluntary statement to Officer Cheek and that he had periodic blackouts. He also claimed that he did not commit the offenses alleged in this case. He stated that he had been in special education since fourth grade and had a fifth or sixth grade reading level. His family described him as learning disabled but, despite the defense attorney's best efforts, no one ever characterized

Hupp as retarded. Indeed, Hupp had passed the written test to acquire a motorcycle license in Texas and he drove his own motorcycle. Furthermore, Hupp worked as second cashier in a delicatessen. Although Hupp was involved in special education classes, he was able to graduate from high school through a work program.

Based on the facts set out above, the jury found Hupp guilty. During the punishment phase of the trial, in response to questions from his attorney, Hupp testified:

Q. Do you understand getting at [sic] rather than saying you don't remember it anymore, you are just going to have to adopt it as being true?

A. Well, I'm—

Q. And from there, that's the only way you are going to be able to get any help?

A. Well, yes, sir, I am saying that the jury has found me guilty of these charges. I am not denying that I did not do them. All I am saying is that I do not remember if I did these crimes or not. I'm saying if I did do these crimes, that I need help for myself instead of TDC. If I go down to TDC, I'm more likely going to come out to be almost three times worse than I was before I went in.

Q. If you come out?

A. If you [sic] come out, *I am probably going to be three times worse, and probably have revenge on my mind to go out and kill all of the people who put me there.*

(Emphasis added.)

No further questions were asked by either side; both sides then closed. The court charged the jury, in pertinent part, as follows:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the sentence imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work as-

signments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-third of the sentence imposed or 20 years, which ever [sic] is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than six years, he must serve at least two years before he is eligible for parole. Eligibility of parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

This charge is identical to the charge contained in section 4 of article 37.07 of the Texas Code of Criminal Procedure.

In addition to the statutory charge, the trial court also gave the following additional charge:

You are further instructed that in determining the punishment in this case, you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of the State of Texas and are no concern of yours.

The trial court also charged the jury "that it [was] only from the witness stand that the jury is permitted to receive evidence regarding the case;" and that "[they were] bound to receive the law from the Court, and be governed thereby."

The State waived opening argument on punishment. During closing arguments, the defense attorney argued:

There's theory looking at that [referring to "considering punishment"], and that is three-fold: Deterrence, punishment and rehabilitation. Now, what we are asking for is not punishment because we don't really feel it would be appropriate. Now, there would be a certain amount of deterrence, whether he went to Terrell for some sort of treatment, there as a condition of probation, or there would also be a certain amount of deterrence if he got time down at the Texas Department of Corrections. We are asking for a certain amount of rehabilitation as well as the deterrence. And we are asking for that to be served by being placed in Terrell Hospital to where he can get a handle on what seems to be his problem, face these problems and hopefully, he will never again have anything like this jump up.

Now, even if you were to put a life sentence on him, like what is possible, it has been explained to you it didn't used to be the law, but now you are allowed to really understand what's going on and see the whole picture. And it just comes down like this: With him being about twenty, unless things were just stacked up, he could easily be out long about the time that he was forty. And if he didn't have the problems addressed, he could still be a menace to society.

I can see that you are all mature individuals and you are taking this quite seriously. I am not saying that anything that he has been convicted of is to be condoned, but we as citizens owe it to ourselves, to society, to the community, and the victims to try to get this man some help to where no one else will suffer from his hands and let's make this

world a little bit better place. And with that, we ask you for probation.

We are not going to try to be just completely ridiculous. We ask you to set it at the maximum and that is ten years probation and we ask you to also set conditions of being placed in a mental institution, Terrell being acceptable as far as we are concerned. It's not the only alternative, but that's one we're aware of.

\*    \*    \*    \*    \*    \*

We're not wanting this young man to just be turned out on the streets, scot-free. Something needs to be done. He has not been convicted of any crimes of violence. He is not a pistol-packer. He is not a drug dealer. *And he does not need to be down there in South Texas taking a cotton-picking test and being with most people who are killers and the like.*

(Emphasis added.)

During its closing argument, the State argued against probation and emphasized that the "last words ... of [the] Defendant ought to tell you what he's capable of and what's in his heart." The only reference to parole by the State was: "The State submits he ought to be living in TDC, the only place for him, where they have got a lock and key and he can't get out until the Parole Board says he can."

Punishment for the offense of aggravated sexual assault ranges from a minimum of imprisonment for five years to a maximum of life or ninety-nine years, and a fine of up to $10,000. *See* TEX. PENAL CODE ANN. § 12.32(a), (b) (Vernon Supp.1989). The jury assessed punishment at life in each case. Based on these facts, we must now decide if the unconstitutional parole instruction contributed to the punishment assessed.

■ As the Court of Criminal Appeals has previously held, the additional curative charge stating that the jury may not discuss the effect of good conduct time or parole law creates a rebuttable presumption. *See Rose v. State,* 752 S.W.2d at 554.

The rebuttable presumption is that the jury will follow the court's instruction and refrain from considering the effect of good conduct time or parole law. *Id.* Therefore, unless there is something to rebut the presumption, we must conclude that the jury followed the Court's curative instruction and did not discuss the effect of good conduct time and the parole law. We find nothing in this case that rebuts the presumption.

■ Additionally, even if it could be shown that the jury considered the statutory parole instructions, it does not necessarily follow that such consideration contributed to the defendant's punishment. *Payne v. State,* 766 S.W.2d 585, 586 (Tex. App.—Dallas 1989, pet. filed); *see Smith v. State,* 764 S.W.2d 31, 33 (Tex.App.—Dallas 1989, pet. granted). The question that this Court must decide is whether the submission of the instruction and the jury's consideration of the instruction contributed to the jury's assessment of Hupp's punishment. *See Smith,* 764 S.W.2d at 33.

■ In this case, the primary question is whether the fact that the attorneys mentioned the statutory instruction during closing argument must necessarily lead us to the conclusion that the statutory instruction contributed to the jury's assessment of Hupp's punishment. We hold that it does not.

Under the specific facts of this case, the defense attorney's argument[4] mentioning the parole law is insufficient to persuade us that the instruction contributed to the punishment assessed. Read in context, it is clear that the focus of defense counsel's argument was probation for his client, not time in TDC, and that any reference to the parole law was incidental. As far as the State's mention of the "Parole Board" in its argument, we conclude that it simply reiterates the Court's curative instruction that parole is not a proper matter for the jury's consideration, but, rather, for the parole board's.

In conclusion, the unrebutted presumption that the jury followed the trial judge's

---

**4.** This opinion should not be construed as relying on the doctrine of invited error.

additional curative instruction not to discuss the effect of good conduct time or parole law, when coupled with the ages of the victims, the nature and overall surrounding circumstances of these offenses, the expert testimony of Dr. Grigson and Dr. Cook, and Hupp's not-so-subtle threat that, if sent to prison, he "would probably have revenge on [his] mind to go out and kill all of the people who put [him] there," militate in favor of harsh sentences and lead us to the conclusion that the statutory parole instruction did not affect Hupp's sentences which were allowed to run concurrently. *See Rose*, 752 S.W.2d at 554–55. Additionally, neither the State nor the defense mentioned parole or the statutory instruction during voir dire, and there were no notes or other indications from the jury that they considered the parole law. For all the foregoing reasons, we hold, beyond a reasonable doubt, that the error made no contribution to the punishment assessed and we affirm the trial court's judgments. *See id.;* TEX.R.APP.P. 81(b)(2).

HOWELL and ROWE, JJ., dissent.

KINKEADE, J., did not participate.

ROWE, Justice, dissenting.

I dissent. I am unable to agree with the majority's conclusion that beyond a reasonable doubt the error in question made no contribution to the punishment of life imprisonment which the jury assessed for appellant. In my opinion the majority has placed unwarranted emphasis upon certain "curative" instructions by the trial judge.

At the outset I note that the presumption relied upon by the majority, i.e. that a jury has followed the trial judge's instructions, is not a presumption of the evidentiary type which itself constitutes some proof if not rebutted by contradictory testimony. Rather, the presumption in question is procedural in nature. It is a device utilized by appellate courts to affirm a judgment after it has been determined that the potential for prejudice flowing from the introduction of objectionable material is capable of being cured by a subsequent instruction to disregard. As the Court of Criminal Appeals wrote in *Gardner v. State.*

In the vast majority of cases in which argument is made or testimony comes in, deliberately or inadvertently, which has no relevance to any material issue in the case and carries with it some definite potential for prejudice to the accused, this court has relied on what amounts to an appellate presumption that an instruction to disregard the evidence will be obeyed by the jury. *See* 1 R Ray, Texas Practice, Law of Evidence, § 29 (3rd ed. 1980); *Thompson v. State*, 612 S.W.2d 925 (Tex.Crim.App.1981). In essence this Court puts its faith in the jury's ability, upon instruction, consciously to recognize the potential for prejudice and then consciously to discount the prejudice, if any, in its deliberations.

730 S.W.2d 675, 696 (Tex.Crim.App.1987).

In assessing the potential for prejudice which arose from the giving of the statutory parole instructions, I would treat this acknowledged error as being what it substantively is—the introduction of inadmissible evidence. Further, since the Court of Criminal Appeals has held that no specific objection is necessary to preserve error in this instance, I would treat the introduction of this evidence as having occurred after due objection.

After the trial judge had given his unconstitutional jury instruction detailing the essential aspects of parole, appellant's counsel sought to convince the jury that rather than assess a lengthy prison term, it should grant his client probation. Counsel sought probation upon condition that appellant be placed in a mental institution for psychiatric treatment and hopefully for a cure of appellant's sexual disfunction. Appellant had already testified that he feared that imprisonment would turn him into a hardened criminal—maybe even a murderer after his release from prison. In this context, for the purpose of thwarting the jurors' adverse consideration of early release for good conduct time, appellant's counsel argued as follows:

Now, even if you were to put a life sentence on him, like what is possible, it has been explained to you it didn't used

to be the law, but now you are allowed to really understand what's going on and see the whole picture. And it just comes down like this: With him being about twenty, unless things were just stacked up, he could easily be out long about the time that he was forty. And if he didn't have the problems addressed, he would still be a menace to society.

These remarks called the jurors' attention to a significant consequence of the parole law with respect to the offender in this particular case.[1]

We know from *Rose* that the prejudice flowing from the introduction of parole related evidence is capable of being ameliorated, although not entirely cured, by subsequent instruction. The problem with the case before us, however, is that certain parole related evidence was heard by the jury *after* all curative instructions had been given. After the new evidence had come in, there was no additional instruction to disregard. Thus, to my way of thinking, this procedural appellate device cannot be utilized at all in connection with our harm analysis. To state the matter simply, the majority should have conducted its analysis without resort to this prop. Undoubtedly, if it had done so, the result would have been different.

Although the evidence in the record overwhelmingly supports the conviction of guilt and the offenses charged are heinous, the facts do not entirely militate in favor of the harshest possible sentence of life on both counts. Appellant was a young uncle of both complainants. He was of subnormal intelligence and lived with them of economic necessity in cramped family accommodations. He was capable enough, however, to keep for several years a menial job at minimal wages—most of the gain from which he contributed regularly to family upkeep. While threats were used to conceal the offensive conduct from adult family members, no threats or physical violence were used in commission of the offenses. To the contrary, appellant's general behavior within the family unit appeared to be harmonious albeit withdrawn. Even the two psychiatric experts who were called gave no testimony that appellant should be considered violent. Further, the gravity of the offenses for purposes of punishment was not compounded by any prior criminal misconduct. For these considerations, I am unable to find beyond a reasonable doubt that the error made no contribution to the punishment assessed. TEX.R. APP.P. 81(b)(2). I would reverse the sentence of life imprisonment and remand the cause for another trial.

---

1. I note that these remarks of appellant's counsel do not constitute invited error because an exception to the rule of curative admissibility is applicable here. *Maynard v. State,* 685 S.W.2d 60, 65 (Tex.Crim.App.1985). Appellant had the right of neutralizing the prejudicial effect on him of the parole related materials by emphasizing some different feature of their prejudicial impact, to wit: appellant's earlier return to society as an untreated sex criminal. Contrary to what is thought to be the chief result of disclosing the truth about the parole laws, i.e. imposition of stiffer penalties, appellant's counsel certainly did not want his remarks to increase his client's sentence. What he was patently attempting to do was to meet and divert the normally expected result. Such a maneuver is privileged under the circumstances.