**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00055-CR**
_____

**DONTRIEL KEYON PIPER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 14-07-07881-CR**

**MEMORANDUM OPINION**

A grand jury indicted Dontriel Keyon Piper (Appellant or Piper) for the offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2011). A jury found Piper guilty, and the court assessed punishment at forty-five years' confinement. In three issues, Appellant appeals his conviction. We overrule all Appellant's issues and affirm the trial court's judgment.

1

The indictment[1] alleged that Piper,

> . . . while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly threaten[ed] or place[d] [A.R.] in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm[.]

Testimony of A.R.

A.R. testified that she is a sales consultant at Thomas Markle Jewelers in The Woodlands. According to A.R., she was working at the store on July 17, 2014. A.R. explained that a customer she was helping "disappeared[,]" a different man appeared in front of her, and she saw a double-barreled shotgun in her face. According to A.R., the man with the shotgun yelled for her to get down, so she dropped to her knees and put her hands on her head. A.R. testified that the man also pointed the gun at another employee. A.R. further explained that she was thrown to the ground and hit on her head, she heard a sound like bullets, and the intruder broke the glass cases and took more than forty watches. A.R. testified that during the incident, she felt threatened and thought she was dying, and that it was "the worst experience [she had] ever, ever had."

---

[1] We use initials to refer to the alleged victim. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

According to A.R., after the incident, the police were called and she gave them a statement. A.R. agreed that in her statement to the police she described one of the intruders as "5'8", heavy, wearing [a] white sweater, clean face, blue pants," and pointing a shotgun at her. A.R. explained that she saw other men running, the person who was in front of her with the gun in her face was wearing a hoodie, and it was hard for her to judge his weight. A.R. agreed that, at some time following the robbery, she identified two individuals from photographs the police showed her. She also testified that she had looked at photographs taken from the store's security system that she agreed fairly and accurately depicted what took place in the store that evening. At trial, A.R. agreed that State's Exhibit 11B depicted "the gunman[.]" She also agreed that Exhibits 11C through 11G showed two individuals who smashed the glass case in the store. State's Exhibits 11A through 11G were admitted.

Testimony of Sergeant Jermaine Jenkins

Sergeant Jermaine Jenkins, with the Montgomery County Sheriff's Office, testified that he was called to respond to a robbery at Thomas Markle Jewelers in The Woodlands on July 17, 2014. Jenkins explained that, upon arriving at the store, he spoke with a male employee and received information about a suspect's vehicle—a white, four-door Nissan—and was informed that one of the suspects had a shotgun. Jenkins testified that he observed a glass case inside the store that had been shattered

3

as well as a rubber mallet and an adjustable wrench. Jenkins identified State's Exhibits 8A through 8J as photographs of the store taken that day, which included a view of shattered glass on the floor, a rubber mallet inside a jewelry case, an adjustable wrench, and a watch that was dropped on the floor. State's Exhibits 8A through 8J were admitted.

Jenkins also testified that he was in charge of securing the scene at a Sonic restaurant where officers took four suspects into custody and where the suspects' vehicle had wrecked. Jenkins estimated that the Sonic was over twenty-five miles from the jewelry store. According to Jenkins, Piper was not taken into custody at the Sonic but Piper was found in a backyard in a neighborhood west of the shopping center where the Sonic is located.

Sergeant Jenkins identified State's Exhibits 10A through 10K as photographs that fairly and accurately depict items he saw on July 17, 2014, including a close-up of the Nissan with a bent license plate, the wrecked car and airbags that had deployed, a shotgun found in the vehicle, mechanic's gloves, a backpack, watches, and watch "pillows" that had been used to display watches. According to Jenkins, watches were found inside a bag as well as loose in the vehicle. Jenkins described the shotgun as having a "stock that had been modified, and there was electrical tape wrapped around it for grip. . . ." State's Exhibits 10A through 10K were admitted.

4

Testimony of Deputy Mowen Abdelbaky

Deputy Mowen Abdelbaky, with the Montgomery County Sheriff's Office, testified that he heard about the robbery at Thomas Markle Jewelers on his police radio and that he was involved with the pursuit of the suspects on I-45 and the Hardy Toll Road. Abdelbaky explained that information he obtained regarding the incident indicated that three men had entered the store to rob it at gunpoint and that the suspects' vehicle was a "white Nissan Altima with a folded up rear license plate." Abdelbaky testified that about thirty police cars chased the suspects, including officers from Montgomery County, Shenandoah, Houston, and Harris County, and he estimated that at times during the pursuit, the vehicles reached speeds over 100 miles per hour. According to Abdelbaky, eventually the officers found the suspects' vehicle wrecked on West Road.

Deputy Abdelbaky identified State's Exhibit 15 as a fair and accurate representation of the lead officer's video of the pursuit, and the video was published to the jury. Abdelbaky also identified State's Exhibits 16A through 16M as screenshots made from the lead officer's vehicle camera during the pursuit of the suspects' car. Abdelbaky explained that the photographs show the suspects' vehicle running numerous red lights and driving on the wrong side of the road, against

5

traffic. State's Exhibits 16A through 16M were admitted. Video from Abdelbaky's vehicle was also admitted and portions were published to the jury.

Deputy Abdelbaky testified that when he arrived at the location where the suspects' vehicle had wrecked, he saw a suspect "running away from the wreckage[]" and the suspect jumped over a fence into the adjacent neighborhood. Abdelbaky explained that when he saw the suspect go over the fence, he drew his gun and ordered the suspect to the ground. According to Abdelbaky, with the assistance of Deputy Logan, he handcuffed the suspect, patted him down for weapons, and placed him in the back of the patrol vehicle. Abdelbaky identified Piper as the suspect he detained that day. Abdelbaky identified State's Exhibits 18A and 18B as a fair and accurate depiction of Abdelbaky searching Piper that day.

Abdelbaky testified that, after he had detained Piper, he drove back to the location where the suspects' vehicle had crashed, and during the drive, the Deputy asked Piper his name and date of birth. Abdelbaky also testified that Piper asked him "Did y'all get the stuff?" and when Abdelbaky asked what stuff, Piper replied "Jewelry, the jewelry." According to the Deputy, Piper also made a statement that Abdelbaky understood as implying "this is not how I usually am as a person." Abdelbaky admitted that Piper did not resist arrest and that he did not see Piper in possession of a firearm.

6

<u>Testimony of Deputy Jonathan Logan</u>

Detective Jonathan Logan, who was assigned to a patrol unit for the Montgomery County Sheriff's Office also testified. Logan agreed he was one of the officers involved in the apprehension and investigation of the aggravated robbery at Thomas Markle Jewelers on July 17, 2014. Logan explained that, when he first heard the report of the robbery, he was near I-45, and he positioned himself on a southbound lane near the Hardy Toll Road to see if he could spot the suspects' vehicle. According to Logan, the suspects' vehicle was reported to be a white Nissan Altima with "paper plates or bent plates[.]" Deputy Logan testified that he eventually became involved in the pursuit of the Nissan, which led to the area of I-45 and Highway 249, where the Nissan wrecked at a Sonic. Logan explained the situation at the Sonic as follows:

> Initially when I pulled into the parking lot, I noticed the vehicle had already crashed. All the suspects in the vehicle had fled in various directions. I forget for whatever reason, but I followed Deputy Abdelbaky on 249 to a street. It was, like, a subdivision, I would guess you would say, west of where the Sonic is, is where we apprehended [Piper].

Logan agreed that State's Exhibit 21 was a video made from his vehicle and that it was a fair and accurate depiction of the chase of the suspects' vehicle to the Sonic. State's Exhibit 21 was admitted and published to the jury. According to Logan, the speed of the pursuit was "up to 120 miles an hour." Logan agreed that State's

7

Exhibits 18A and 18B are "basically" screenshots from the video made from his vehicle that show him and Deputy Abdelbaky apprehending Piper. Logan also agreed that the items in the photo in State's Exhibit 22 were recovered from another suspect—the person who drove the white Nissan Altima. Logan also testified that after the suspects were in custody, he assisted in a search of the area of the arrest, and he did not find any firearms or deadly weapons during that search.

<u>Testimony of Detective Brad Curtis</u>

Detective Brad Curtis, with the Montgomery County Sheriff's Office, testified that he responded to a call on July 17, 2014, concerning an aggravated robbery at the Thomas Markle jewelry store in The Woodlands. Curtis also explained that he participated in the pursuit of the suspects' vehicle that ended at the Sonic, where officers found the wrecked Nissan "completely unoccupied[,]" indicating to him that the suspects were on foot. Curtis testified that he was involved in detaining one suspect in the parking lot of the Sonic and another suspect inside the Sonic.

Curtis testified that he took photographs of the inside and outside of the Nissan, that State's Exhibits 10A through 10G are the photographs he took, and that the photographs fairly and accurately depict the Nissan and its contents. Curtis also explained that he escorted the white Nissan back to the crime lab and that State's Exhibits 19A through 19I were photographs taken at the crime lab that fairly and

8

accurately depict the Nissan and its contents. Curtis testified that State's Exhibits 19F and 19I show some of the watch "pillows" that were found inside the Nissan. Curtis further testified that State's Exhibits 20A through 20F were additional photographs of items that were in the white Nissan that were taken at the crime lab. Curtis explained that these photographs show a backpack found in the Nissan that contained watches and broken glass, a shotgun with a taped handle, three shotgun rounds, a work glove, and a watch "pillow." State's 19A through 19I and 20A through 20F were admitted.

Testimony of Detective Michael Traylor

Detective Michael Traylor, a detective with the major crimes division of the Montgomery County Sheriff's Office, testified that he was called to gather evidence at the Thomas Markle Jewelers and the Sonic and that he was involved in submitting evidence to the crime lab. Traylor also explained that he was involved in collecting Rolex watches and returning them to Thomas Markle Jewelers. Detective Traylor identified State's Exhibit 24 as a list of the evidence and watches that were stolen from the store. According to Traylor, "[p]robably 25 to 30[]" Rolex watches had been stolen.

Testimony of Detective Steve Mullis

Detective Steve Mullis, with the major crimes division of the Montgomery County Sheriff's Department, testified that he was called to investigate the robbery. Mullis explained that he and his partner were asked to interview the four suspects, and Mullis identified Piper as one of the suspects he interviewed. According to Mullis, he and his partner gave Piper written *Miranda* warnings, and Piper signed a waiver wherein he agreed to waive his rights in making a statement. Mullis testified that after the interview began, Piper decided he would rather have his attorney, but then subsequently decided he wanted to talk to the detectives.

The jury charge included the following instruction on the law of parties:

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the July 17, 2014, in Montgomery County, Texas, the defendant, Dontriel Keyon Piper, did then and there unlawfully, while in the course of committing theft of property and with intent to obtain or maintain control of the property, intentionally or knowingly threaten or place [A.R.] in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm; OR if you find from the evidence beyond a reasonable doubt that on or about the July 17, 2014, in Montgomery County, Texas, Lawrence Robertson, Ondra Moore, or Christopher Thurman did then and there unlawfully, while in the course of committing theft of property and with intent to obtain or maintain control of the property,

10

intentionally or knowingly threaten or place [A.R.] in fear of imminent bodily injury or death, and Lawrence Robertson, Ondra Moore, or Christopher Thurman did then and there use or exhibit a deadly weapon, to-wit: a firearm, and that the defendant, Dontriel Keyon Piper, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Lawrence Robertson, Ondra Moore, or Christopher Thurman to commit the offense, if he did, then you will find the defendant guilty of aggravated robbery, as charged in the indictment.

The jury found Piper guilty as charged in the indictment. Piper elected to have his punishment decided by the court. After a presentence investigation, the trial court held a trial on punishment, and the court sentenced Piper to forty-five years' confinement.

DOUBLE JEOPARDY CHALLENGE

In his first issue, Appellant argues that the trial court abused its discretion in denying his application for writ of habeas corpus based on prosecutor misconduct because the prosecutor's conduct "was intended to force a mistrial to deny the Appellant a favorable jury panel." Citing to *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982), Appellant argues that an acquittal based on double jeopardy should be granted when the prosecutor's conduct is intended to provoke a defendant into moving for a mistrial.

In this case, voir dire commenced on July 20, 2015. While addressing the venire panel, the prosecutor stated the following:

11

> . . . this is an aggravated robbery, threat with a deadly weapon. If you're chosen, you're going to hear that a firearm is alleged in the indictment. I've got to prove that. No problem. I wouldn't have gotten up and put my suit on this morning if I didn't think we could prove this case.

The defense moved for a mistrial, arguing that the State was "bolstering evidence that has not even been proven[]" and that a curative instruction would not be sufficient. The court declared a mistrial and dismissed the venire panel.

Piper then filed for habeas relief, arguing that subsequent prosecution should be barred by double jeopardy because "the prosecutor's conduct was intended to provoke or goad defense counsel into moving for a mistrial" and that a new trial could be "tantamount to rewarding the State for reprehensible conduct." The record includes no order granting or denying habeas relief. The court subsequently granted Piper's motion to change venue and ordered that the cause be moved to Galveston County for trial. A second voir dire commenced on September 14, 2015, and after trial, the jury found Piper guilty of the offense charged. Appellant concedes in his brief that the "[t]rial in Galveston was prosecuted by a different prosecutor and the jury was selected and seated without any misconduct[.]"

If a defendant has been indicted but not tried, he may assert his constitutional protection against double jeopardy by filing a pretrial application for writ of habeas corpus. *See* Tex. Code Crim. Proc. Ann. art. 11.07, § 2 (West 2015); *see, e.g., Ex*

12

*parte Watkins*, 73 S.W.3d 264, 267 (Tex. Crim. App. 2002); *Ex parte Rathmell*, 717 S.W.2d 33, 34 (Tex. Crim. App. 1986). A habeas corpus proceeding is not merely another motion within the criminal prosecution; rather, it is a separate proceeding. *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*, 159 S.W.3d 645, 649 (Tex. Crim. App. 2005). An order denying relief on the merits in the habeas corpus proceeding is a final judgment that is immediately appealable. *Id.* at 650; *Kelson v. State*, 167 S.W.3d 587, 594 (Tex. App.—Beaumont 2005, no pet.). A pretrial writ is the preferred method of bringing a double jeopardy claim based on multiple prosecutions because the defendant may immediately appeal if the trial court denies the petition. *See Gonzales v. State*, 8 S.W.3d 640, 643 n.9 (Tex. Crim. App. 2000); *Kelson*, 167 S.W.3d at 591; *see also Ex parte Robinson*, 641 S.W.2d 552, 555 (Tex. Crim. App. 1982) ("[T]here is a Fifth Amendment right not to be exposed to double jeopardy, and that it must be reviewable before that exposure occurs.").

Here, the record does not reflect that Piper instituted a habeas proceeding separate from the criminal prosecution, nor does the record include an order denying Piper's application for writ of habeas corpus.[2] We therefore dismiss that part of

---

[2] Both the Appellant's and State's briefs allege that the trial court denied Piper's application for writ of habeas corpus, but neither brief provides a citation to the record supporting the assertion.

Appellant's first issue complaining of the trial court's denial of habeas relief for lack of appellate jurisdiction. *See Kelson*, 167 S.W.3d at 594; *see also Greenwell*, 159 S.W.3d at 650 ("[W]e have expressly disapproved implying the existence of a habeas action from proceedings in a criminal prosecution when a separate habeas action has not been filed."); *Jordan v. State*, 54 S.W.3d 783, 786 (Tex. Crim. App. 2001) ("We hold that, if a probationer wishes to invoke the trial court's writ of habeas corpus jurisdiction, he must follow the proper procedures outlined in Article 11[]" of the Rules of Criminal Procedure.).

Nevertheless, a double jeopardy claim may be raised for the first time on appeal following a conviction "if two conditions are met: (1) 'the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record'; and (2) 'when enforcement of the usual rules of procedural default serves no legitimate state interest.'" *See Langs v. State*, 183 S.W.3d 680, 686-87 & n.22 (Tex. Crim. App. 2006) (quoting *Gonzalez*, 8 S.W.3d at 643). Appellant must satisfy both prongs of this test in order to raise his complaint for the first time on appeal. *Id.*; *see also Bigon v. State*, 252 S.W.3d 360, 369 (Tex. Crim. App. 2008). Accordingly, our initial inquiry is whether the record before us clearly reflects a double jeopardy violation. *See Roy v. State*, 76 S.W.3d 87, 93 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

For double jeopardy to bar a subsequent prosecution, jeopardy must have attached. *See York v. State*, 342 S.W.3d 528, 551 (Tex. Crim. App. 2011); *see also United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977) (before double-jeopardy protections are implicated, jeopardy must have attached); *State v. Moreno*, 294 S.W.3d 594, 597 (Tex. Crim. App. 2009) (same). "[J]eopardy attaches at the time the jury is empaneled and sworn." *State v. Blackshere*, 344 S.W.3d 400, 404 (Tex. Crim. App. 2011). In this case, Piper requested a mistrial before a jury was empaneled and sworn. Therefore, even assuming that the prosecutor "goaded" the defendant into requesting a mistrial, because jeopardy had not attached, double jeopardy would not bar Piper's subsequent prosecution. *See Ex parte George*, 913 S.W.2d 523, 527 (Tex. Crim. App. 1995) ("If appellant was neither put in jeopardy for nor ever actually acquitted of the charged offense, then the prosecution pending against him for that offense is not barred by the Double Jeopardy Clause[.]"). Accordingly, we find no error, and we conclude that Piper's prosecution and conviction were not barred by double jeopardy. We overrule Appellant's first issue.

## MOTION FOR MISTRIAL

In his second issue, Appellant argues that the trial court abused its discretion by denying his motion for mistrial based on an alleged *Brady* violation. According to Appellant, "[t]he outcome of this case was greatly affected because the trial Judge

15

at first admitted recordings of Appellant confessing to the crime and talking about his participation and remorse concerning the crime, but then, upon learning of the *Brady* violation, suppressed all of these statements and [related] recordings[.]" Appellant argues that although the court instructed the jury to disregard the evidence, a curative instruction was insufficient and "it was impossible for this jury or any jury to take that evidence out of their minds."

Two Recorded Verbal Statements, Waivers, and Letter

Prior to trial, the court considered the defense's motion to suppress statements—two recorded verbal statements and one written letter—made by Piper. After hearing testimony and argument, the trial court admitted the statements except for Piper's responses to questions by the arresting officer regarding what Piper was doing in The Woodlands other than being at Thomas Markle Jewelers. The defense then reurged its motion to suppress, requesting that the court strike all the recordings.

At the end of the first day of trial, State's Exhibits 25, 26, and 27 were admitted into evidence and published to the jury. State's Exhibits 25 and 26 were *Miranda* warning and waiver forms on which Piper had initialed his acknowledgement that he had received *Miranda* warnings and had signed his agreement to waive his rights and make a statement.

16

On the second day of trial, outside the presence of the jury, the State's attorney told the court that he had learned of an additional audiotape after the deadline for discovery had passed. The State's attorney described the audiotape as "an audio version" of the video in State's Exhibit 27. The court conducted a hearing on the audiotape. Detective Chad May testified that it was "pretty standard[]" for detectives to use a pocket digital data recorder in addition to using the cameras in the interview rooms that were connected to the COBAN system. Deputy Mullis testified that at the time of the Piper interview, the recording system in the interview rooms was known to have problems, and therefore, he used a separate audio recorder during the interview. Mullis also explained that he used the separate audio recording when writing up his reports. According to Mullis, the IT department had explained to him that the Piper interviews were not archived and had been purged from the system.

Comparing the audio and video recordings of the Piper interview, the court explained as follows:

> When you play that part to the jury withholding the audio tape, it seems to be that [Piper] is not cooperating. However, when you listen to the audio tape, it's clear he is over cooperating. He is doing everything he can. That's why I'm finding it is Brady, and I am finding it is material. It's extremely material because I think it's highly prejudicial to present a video tape without the audio tape.

17

The court granted the defense's motion to suppress, suppressing State's Exhibits 3, 4, 5, 6, 25, 26, and 27.[3] The court also stated that it would "instruct the jury when they come back that they are to disregard those items and any testimony or evidence that flows therefrom."

The defense moved for a mistrial, arguing as follows:

> . . . I don't know how to unring the bell here. I'm very worried that a limiting instruction may not provide an adequate insulation. And I am certainly not indicting the [prosecutors] of any kind of misconduct. But this is a very, very troubling situation to be in from the defense perspective. . . .

The court denied the motion for mistrial and concluded there had been no prosecutorial misconduct. When the jury returned to the courtroom, the court gave the following instruction:

> . . . State's 25, 26, 27, have all been suppressed. What that means is that those exhibits include the video tape that you saw a portion of, for purposes of your deliberations, you shall not consider that for any purpose whatsoever. It's as if you never even saw it. I know that's hard for some people to do. But I want to make it clear that it is not in evidence in this case. Additionally, the Miranda warnings that were given have been excluded, and I'm ordering you to the same instruction. You're not to regard or consider them for any purpose whatsoever. If another juror starts to talk about them or say, you know, I think since I saw that, you -- it's your duty, each of you, to remind them, no, we can't consider that, that's not evidence in this case.

---

[3] The reporter's record reflects that State's Exhibits 3, 4, 5, and 6 were admitted during the pretrial hearing but not during trial to the jury.

18

## Standard of Review

We review a denial of a motion for mistrial under an abuse of discretion standard of review. *See Archie v. State*, 340 S.W.3d 734, 738-39 (Tex. Crim. App. 2011) (citing *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004)). We must uphold a trial court's ruling on a motion for mistrial if it was within the zone of reasonable disagreement. *See Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). "A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). A mistrial should be granted only when less drastic alternatives fail to cure the prejudice. *Id.* at 884-85.

Because the trial court sustained Appellant's objections, "[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial." *Hawkins*, 135 S.W.3d at 76-77; *see also Archie*, 340 S.W.3d at 738.

## Applicable Law

A trial court may declare a mistrial when an error occurs that is "'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

19

Whether a trial court abused its discretion in denying a motion for mistrial depends on whether the court's instruction cured any prejudicial effect. *See Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995); *Faulkner v. State*, 940 S.W.2d 308, 312 (Tex. App.—Fort Worth 1997, pet. ref'd). Generally, an instruction to disregard cures the prejudicial effect except in extreme cases. *Dinkins*, 894 S.W.2d at 357; *Waldo v. State*, 746 S.W.2d 750, 752 (Tex. Crim. App. 1988) (noting the "well settled" rule that error in admitting improper evidence generally may be corrected by an instruction to disregard except in extreme cases) (quoting *Miller v. State*, 185 S.W. 29 (1915)); *Woodall v. State*, 77 S.W.3d 388, 399 (Tex. App.—Fort Worth 2002, pet. ref'd); *cf. Wesbrook v. State*, 29 S.W.3d 103, 115-16 (Tex. Crim. App. 2000) (presuming the jury complied with the court's instruction to disregard prosecutor's comment that was improper but not "flagrant"); *see also Robertson v. State*, No. AP-71,224, 2011 Tex. Crim. App. Unpub. LEXIS 154, at *39 (Tex. Crim. App. Mar. 9, 2011) (not designated for publication) ("Where the prejudice is curable, an instruction to disregard eliminates the need for a mistrial.") *cert. denied*, 132 S. Ct. 844 (2011); *Hawkins*, 135 S.W.3d at 77 ("Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.")

To determine whether the trial court abused its discretion in denying a motion for mistrial, we balance the following factors: (1) the severity of the misconduct or

prejudice, (2) the measures adopted to cure the misconduct or prejudice, and (3) the certainty of conviction absent the misconduct or prejudice. *See Archie*, 340 S.W.3d at 739; *Hawkins*, 135 S.W.3d at 77. Prejudice is the touchstone of the first factor. *Hawkins*, 135 S.W.3d at 77. A mistrial is the appropriate remedy only when the objected-to events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *See Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004).

Analysis

In this case, the trial court expressly found there had been no prosecutorial misconduct regarding the audiotape. Although Appellant's amended motion for new trial alleged prosecutorial misconduct, Appellant's brief on appeal does not make such allegations. We presume that jurors follow instructions to disregard and other cautionary instructions in the absence of evidence that they did not. *See Ladd*, 3 S.W.3d at 567 (quoting *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). The prejudicial effect of an error, even of constitutional proportions, is lessened by the absence of flagrancy and persistency and an instruction to disregard. *See Perez v. State*, 187 S.W.3d 110, 112-13 (Tex. App.—Waco 2006, no pet.) (citing *Johnson v. State*, 83 S.W.3d 229, 231-33 (Tex. App.—Waco 2002, pet. ref'd)). Appellant's argument that "it was impossible for this jury or any jury to take that

21

[suppressed] evidence out of their minds[]" is conclusory, and Appellant cites no evidence that the jurors did not follow the court's instruction to disregard and actually concedes there is no evidence of the effect of the suppressed evidence on the jury's deliberations or verdict.

Furthermore, considering all the other evidence, we conclude that the certainty of conviction was strong even without the objectionable evidence. The jury heard testimony by A.R., who was working at Thomas Markle Jewelers on July 17, 2014, and that she was threatened by a man with a shotgun who broke a glass case in the store and took more than forty watches. Sergeant Jenkins testified that he responded to the robbery at Thomas Markle Jewelers and also at the Sonic where four suspects were taken into custody. Jenkins also testified that Piper was taken into custody in a neighborhood adjacent to the Sonic restaurant where the suspects' vehicle had wrecked. Deputy Abdelbaky testified concerning the high-speed pursuit of the white Nissan that culminated in his detention of Piper after Piper had run from the wrecked Nissan and jumped a fence. Abdelbaky also testified that Piper asked him "Did y'all get the stuff?" and when Abdelbaky asked what stuff, Piper then said "the jewelry." Detective Logan also described his pursuit of the suspects' vehicle that crashed at the Sonic and explained that he and Deputy Abdelbaky apprehended Piper in a neighborhood west of the Sonic. Detective Curtis testified that he

22

participated in the pursuit of the suspects' vehicle from The Woodlands to the Sonic and that he was involved in detaining two of the suspects in or near the Sonic. Detective Traylor testified that he submitted evidence to the crime lab in this matter and that he returned dozens of watches to Thomas Markle Jewelers. Numerous photos were admitted into evidence that showed the jewelry cases at Thomas Markle Jewelers with broken glass; the high-speed pursuit of the Nissan; the wrecked Nissan; and broken glass, watches, and a shotgun inside the Nissan. Based on other evidence and testimony at trial, a reasonable jury could have found Piper guilty of aggravated robbery based on his own conduct or under the law of parties, even without the objectionable evidence. We assume that the jury followed the trial court's instruction to disregard the objectionable evidence. *See Ladd*, 3 S.W.3d at 567. We conclude that the trial court's ruling denying the motion for mistrial was not outside the zone of reasonable disagreement. *See Coble*, 330 S.W.3d at 292. We overrule Piper's second issue.

## PRESENCE OF AN ALTERNATE JUROR

In his third issue, Appellant argues that the jury's privacy was violated during deliberations by the presence of an alternate juror and that such requires a new trial. According to Appellant, the alternate juror was permitted to remain with the jury during deliberations, which constitutes a violation of article 36.22 of the Texas Code

23

of Criminal Procedure and from which harm to the defendant is presumed. Appellant argues that "[n]o one can say what impact the alternate juror had on deliberations" and harm is presumed because the error is "a direct violation" of the Texas Constitution.

Article V, section 13 of the Texas Constitution provides that "petit juries in the District Court shall be composed of twelve persons[.]" Tex. Const. art. V, § 13. Article 36.22 of the Code of Criminal Procedure provides that "[n]o person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22 (West 2006).

The Court of Criminal Appeals has explained that the presence of an alternate juror in the jury room does not mean that the jury was composed of more than twelve persons, even if the alternate juror participated in deliberations but did not participate in voting. *See Trinidad v. State*, 312 S.W.3d 23, 28 (Tex. Crim. App. 2010). The Court has also held that there is

> . . . no reason that a defendant should not be deemed to have forfeited the protections of Article 36.22 in the event that he becomes aware of its breach during the course of the trial but fails to call the transgression to the trial court's attention so that the error may be rectified or . . . so that the defendant can make a timely record for appeal.

24

*Id.* at 29; *see also* Tex. R. App. P. 33.1(a)(1) (preservation of error for appeal requires a timely objection at trial and a ruling thereon). Furthermore, an appellant has the burden of proving an allegation of juror misconduct. *See Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000) (addressing an allegation that a jury had conversed with an unauthorized person about the case) (citing *Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995)).

The record in this case does not reflect that Piper objected at trial to the presence of the alternate juror in the jury room, nor did he claim constitutional or statutory error on this point in his motion for new trial. Appellant does not contend that he did not become aware of an article 36.22 issue during the course of trial. Moreover, we lack any basis in the record to conclude that the alternate juror participated or was present during jury deliberations. *See* Tex. R. App. P. 38.1(i). Appellant cites to the eighth volume of the reporter's record to support his assertion that the alternate juror was present during jury deliberations, but he provides no page number or other pinpoint citation.[4] The eighth volume of the reporter's record contains exhibits used during the punishment phase of trial, and we find therein no reference to the alternate juror. In addition, the record reflects that when the jury was

---

[4] The State's brief notes that Appellant's record citation is incomplete. Appellant did not file a reply brief.

25

polled after the jury's guilty verdict was read, the trial court stated that the alternate juror should not respond because she had not participated. On the record before us, and applying *Trinidad*, we conclude that Appellant failed to preserve error, and we overrule his third issue.

Having overruled all of Appellant's issues, we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 23, 2017
Opinion Delivered July 19, 2017
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.